IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No.:

KENNETH HOROWITZ as ASSIGNEE of

UNDERWATER EXPLORATION COMPANY INC

Plaintiff,

vs.

ALLIED MARINE, INC a/k/a FERRETTI GROUP USA, INC

a/k/a FERRETTI GROUP USA,

FERRETTI S.p.A., and

FERRETTI GROUP OF AMERICA, LLC a/k/a FERRETTI GROUP

Defendants.

_____/


## COMPLAINT

**COMES NOW** the Plaintiff, KENNETH HOROWITZ as ASSIGNEE of

UNDERWATER EXPLORATION COMPANY INC., by and through undersigned counsel, and

sues Defendants, ALLIED MARINE, INC, FERRETTI S.p.A., and FERRETTI GROUP OF

AMERICA LLC and alleges:

### PARTIES AND JURISDICTION

1. This is an action for breach of express and implied warranties pursuant to the Magnuson

   Moss Warranty Act, 15 U.S.C. § 2301, et al. in an amount exceeding $50,000 and for

   Revocation of Acceptance under Florida Statute §672.608 in an amount exceeding

   $75,000.00.

2.   This is an action that is within the jurisdiction of this Court pursuant to federal question jurisdiction under 28 U.S.C. §1331 and 15 U.S.C. §2310(d). All claims set forth herein arise from the same operative facts and should be disposed of in a single proceeding.

3.   This Court has supplemental jurisdiction to the extent required to adjudicate any state law claims necessary to address all issues and claims raised in the pleadings. The events, acts, and circumstances giving rise to this action occurred in Florida and venue is proper within this District.

4.   At all times material hereto, Plaintiff was a citizen of the State of Florida residing in Palm Beach County and owner of a certain 2020 Rivamare yacht hull number 38-51 (herein after RIVA) which is the subject of this litigation.

**FERRETTI S.p.A.**

5.   At all times material hereto FERRETTI S.p.A. is an Italian multinational shipbuilding company headquartered in Italy which specializes in the design, construction and sale of luxury motor yachts. Its products are sold under the brands Ferretti Yachts, Custom Line, Pershing, Itama, Riva, Mochi Craft and CRN.

6.   FERRETTI S.p.A. is 100% owner of Defendants ALLIED MARINE, INC and FERRETTI GROUP OF AMERICA, LLC.

7.   FERRETTI S.p.A. entered into a written Organisation, Management and Control Model Pursuant to Italian Legislative Decree 231/2001 in which it adopted corporate governance structures and risk prevention systems to stop managers, executives, employees and external collaborators from committing crimes and to shield itself from criminal and civil penalties for acts committed in Italy as well as abroad such as in this case the United States of America.

8. The corporate purpose of creation of the FERRETTI S.p.A. Control Model is stated as:

Ferretti S.p.A. has deemed it necessary to draw up an Organisational Model in line with the measures of Italian Legislative Decree No. 231 of 2001 and with the Confindustria Guidelines of 07/03/2012 and subsequent amendments and supplements (March 2014), in order to ensure conditions of fairness and transparency when conducting corporate transactions and business.

The model is intended to describe the operational procedures adopted and the responsibilities assigned at Ferretti S.p.A.

The Company believes that its adoption of this Model constitutes, in addition to the measures of law, a valid instrument to inform and raise awareness among not only all its employees (consultants, partners, suppliers, etc.), who carry out their own activity in the name and on behalf of Ferretti, but also all those who interact with it.

9. The Control Model adopted by FERRETTI S.p.A. resulted in FERRETTI S.p.A.:

    a.  creating a Code of Ethics which governs the principles of conduct with which all employees must comply;

    b.  identifying an organizational structure capable not only guaranteeing a clear, organic distribution of duties and implementing segregation of functions, but also of inspiring and monitoring the propriety of all its employers' conduct;

    c.  formalizing a manual and computerized corporate procedures intended to regulate implementation of the activities (the monitoring instrument of "separation of duties" between those implementing crucial phases in a process at risk is especially effective from a preventive viewpoint);

    d.  informing all staff effectively, clearly and in detail not only of the Code ol Ethics, corporate procedures, the penalty system, the powers of authorization and signature, but also of all the appropriate instruments to prevent unlawful acts from being committed;

    e.  preparing a suitable penalty system.

10. The Control Model expressly applies to all members of the FERRETTI GROUP including defendants ALLIED MARINE, Inc dba FERRETTI GROUP USA and FERRETTI GROUP of AMERICA, LLC dba FERRETTI GROUP in which FERRETTI S.p.A. is the parent company.

11. The Control Model states:

. . . . Ferretti Group has decided to operate according to ethical principles aiming to ensure the business activity, corporate purpose and development of all its subsidiaries comply with the laws in force in their respective legal systems. Thus, **Ferretti Group has adopted a Code of Ethics aiming to identify a series of behavioral principles, which the Companies in the Group acknowledge as their own, and with which compliance by the corporate bodies, employees and all those who collaborate and cooperate for any reason with the different companies in the Group is mandatory.** (Emphasis Supplied)

12. At all times material FERRETTI S.p.A. was the registered owner of  the URLs "Ferrettigroup.com" and "Ferrettigroupamerica.com."

13. At all times material FERRETTI S.p.A. engages in a worldwide advertising campaign which includes consumers in Florida to promote and sell the boats in manufactures under its brand including Riva Yachts.

**ALLIED MARINE, INC a/k/a FERRETTI GROUP USA, INC a/k/a FERRETTI GROUP USA**

14. At all times material hereto, Defendant ALLIED MARINE, INC. (hereinafter refered to as "ALLIED MARINE" or "ALLIED MARINE INC".) is a Florida Corporation with its principal place of business and legal address at 1445 SE 16th Street, Fort Lauderdale, Florida and does business as FERRETTI GROUP USA.

15. On August 24, 2010 FERRETTI GROUP USA, INC merged corporately with ALLIED MARINE, INC in which ALLIED MARINE, INC was the surviving entity.

16. FERRETTI GROUP USA is the fictitious name registered to ALLIED MARINE.

17.  ALLIED MARINE conducts business under the name of FERRETTI GROUP USA.

18. ALLIED MARINE is owned 100% by FERRETTI S.p.A.

19. ALLIED MARINE is under the corporate control of FERRETTI S.p.A.

20. At all times material hereto, Defendant ALLIED MARINE, INC. was part of the "Ferretti Group' (as identified in the FERRETTI S.p.A Control Model) subject to the Code of Ethics promulgated by FERRETTI, S.p.A.

21. At all times material hereto, Defendant ALLIED MARINE, INC. was part of the "Ferretti Group" (as identified in the FERRETTI S.p.A Control Model) subject to Control Model promulgated by FERRETTI, S.p.A.

22. ALLIED MARINE's Director, Vice president, Controller and Secretary is Simone Meletti who is employed by Ferretti S.p.A. in Forli Italy as its Group Sales and Marketing Controller. Previously, Melletti worked for FERRETTI S.p.A. as the Group Financial Controller.

23. Simone Meletti is described internally as the Manaing Director for the Americans or the Managing Director of America's.  Meletti signs contracts as Vice President and authorized corporate officer.

24. At all times material hereto ALLIED MARINE INC., doing business as FERRETTI GROUP USA, INC was the apparent and actual agent of FERRETTI S.p.A.

25. ALLIED MARINE advertises to the public it is the Exclusive Dealer for Riva in the United States East Coast.

26. FERRETTI S.p.A. disclosed, ALLIED MARINE is the "exclusive dealer on the eastern coast of the United States for the Group's new yachts,"  in a prospectus relating to

admission to listing on the Electronic Share Market organized and managed by Borsa Italiana S.p.A. of Ordinary Shares of Ferretti S.p.A.

27. ALLIED MARINE's URL "alliedmarine.com" is registered to FERRETI GROUP of AMERICA, dba FERRETTI GROUP which is the seller of the RIVA.

28. At all times material ALLIED MARINE's website's Privacy Statement discloses FERRETTI S.p.A. as the collector and recipient of users' private data.

29. At all times material ALLIED MARINE was the Supplier of the RIVA.

30. At all times material ALLIED MARINE dba FERRETI GROUP USA was the warrantor of the RIVA.

31. At all times material ALLIED MARINE was the manufacturer of the RIVA.

32. The Manufacturers Identification Code embedded in the Hull Identification Number of the RIVA (XFARRM51L920) sold to plaintiff is registered  to FERRETTI GROUP USA (ALLIED MARINE) in filings with the United States Coast Guard.

33. At all times material ALLIED MARINE's registered Trademarks were owned by Ferretti Group of America Holding Company, Inc a Delaware company not registered to do business in Florida

34. At all times material Ferretti Group of America Holding Company, Inc. was a  wholly owned subsidiary of FERRETTI S.p.A.

35. At all times material Simone Meletti is an officer of Ferretti Group of America Holding Company, Inc.

**FERRETI GROUP of AMERICA, LLC dba FERRETTI GROUP**

36. At all times material hereto, Defendant FERRETTI GROUP OF AMERICA, LLC was a Florida Limited Liability Company with its principal place of business and legal address at 1445 SE 16th Street, Fort Lauderdale, Florida.

37. At all times material hereto FERRETTI GROUP OF AMERICA, LLC was the owner and the fictitious name FERRETTI GROUP.

38. At all times material hereto FERRETTI S.p.A was the parent company of the FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP..

39. At all times material hereto FERRETTI GROUP OF AMERICA, LLC was owned 100% by FERRETTI, S.p.A.

40. At all times material hereto FERRETTI GROUP OF AMERICA, LLC was controlled by FERRETTI S.p.A.

41. FERRETTI GROUP OF AMERICA, LLC is under the corporate control of FERRETTI S.p.A.

42. At all times material hereto, Defendant FERRETTI GROUP OF AMERICA, LLC. was part of the "Ferretti Group" (as identified in the FERRETTI S.p.A Control Model) subject to the Code of Ethics promulgated by FERRETTI, S.p.A.

43. At all times material hereto, Defendant FERRETTI GROUP OF AMERICA, LLC. was part of the "Ferretti Group" (as identified in the FERRETTI S.p.A Control Model) subject to Control Model promulgated by FERRETTI, S.p.A.

44. FERRETTI GROUP OF AMERICA, LLC's Managing Director, Vice president, Controller and Secretary is Simone Meletti who is employed by Ferretti S.p.A. in Forli

Italy as its Group Sales and Marketing Controller. Previously, Melletti worked for FERRETTI S.p.A. as the Group Financial Controller.

45. At all times material hereto FERRETTI GROUP OF AMERICA, LLC, doing business as FERRETTI GROUP was the apparent and actual agent of FERRETTI S.P.A.

46. At all times material hereto FERRETTI GROUP OF AMERICA, LLC, doing business as FERRETTI GROUP was the registered owner of ALLIED MARINE dba FERRETI GROUP USA's website (alliedmarine.com) and as such does business under the name of ALLIED MARINE .

47. At all times material hereto FERRETTI GROUP OF AMERICA, LLC, doing business as FERRETTI GROUP's URL "Ferrettigroup.com" and "Ferrettigroupamerica.com" were owned by FERRETTI S.p.A.

48. At all times material both FERRETTI GROUP OF AMERICA's websites' Privacy Statement lists FERRETTI S.p.A. as the collector and recipient of users' private data.

49. At all times material FERRETTI GROUP OF AMERICA, LLC was the Seller of the RIVA.

### FACTS COMMON TO ALL COUNTS

50. At all times material hereto FERRETTI S.p.A.; ALLIED MARINE INC., doing business as FERRETTI GROUP USA, and FERRETTI GROUP OF AMERICA, LLC doing business as FERRETTI GROUP acted in concert to effectuate the sale and distribution of vessels in the United States and particularly in Florida which were manufactured by FERRETTI S.p.A. in Italy but also labeled the subject RIVA's manufacturer as ALLIED MARINE dba FERRETTI GROUP USA.

51. Upon information and belief FERRETTI S.p.A. controlled and oversaw the operations and conduct of business of ALLIED MARINE INC., doing business as FERRETTI GROUP USA, INC and FERRETTI GROUP OF AMERICA, LLC doing business as FERRETI GROUP.

52. FERRETTI S.p.A. is indentifed in the FERRETTI GROUP USA LIMITED WARRANTY as the manufacturer of the of 2020 Rivamare 38-51 (herein after "RIVA") which is the subject matter of this action and delivered the vessel to the United States for sale to consumers.

53. The FERRETTI GROUP USA LIMITED WARRANTY does not disclose ALLIED MARINE dba FERRETTI GOUP USA as the manufacturer of the RIVA.

54. ALLIED MARINE, LLC a/k/a FERRETTI GROUP USA, individually and as agent of FERRETTI S.p.A. marketed for sale the RIVA through its Sales Executive Chris Coughlin.

55. ALLIED MARINE doing business as FERRETTI GROUP USA through its Sales Executive Chris Coughlin was the Selling Broker on the sale of the RIVA to Plaintiff.

56. ALLIED MARINE d/b/a FERRETTI GROUP USA and its Sales Executive Chris Coughlin received a commission as the selling broker from the sale of the RIVA to Plaintiff.

57. FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP entered into a contract for sale of the subject RIVA to Underwater Exploration Company, Inc.  The Purchase and Sale agreement was assigned to Kenneth Horowitz with the approval and consent of FERRETTI GROUP OF AMERICA, LLC., individually and as agent of FERRETTI S.p.A.

58. ALLIED MARINE dba FERRETTI GROUP USA represented through its Sales Executive Chris Coughlin that a warranty on the yacht was to be given to the purchaser by the manufacturer, FERRETTI S.p.A.

**THE SHELL GAME**

59. FERRETTI S.p.A intentionally and cunningly created a corporate maze in an attempt to deceive consumers and to shield itself from Federally created remedies under the Magnusson Moss Warranty Act and certain remedies under state law.

60. FERRETTI S.p.A created a structure in which its "exclusive dealer [ALLIED MARINE] on the eastern coast of the United States for the Group's new yachts" did not sell the yacht. Instead its wholly owned subsidiary FERRETTI GROUP of AMERICA dba FERRETTI GROUP sold the yacht while the "exclusive dealer" ALLIED MARINE became the warrantor under its fictitious name, FERRETTI GROUP USA and the manufacturer on the RIVA's Hull Identification Number under the fictitious name of FERRETTI GROUP USA.

61. The RIVA was marketed to Plaintiff by ALLIED MARINE dba FERRETTI GROUP USA Sales Executve Chris Coughlin.

62. Throughout the transaction leading up to closing, the Plaintiff's contact with the Seller was through ALLIED MARINE's Sales Executive, Chris Coughlin.

63. Neither Chris Coughlin nor ALLIED MARINE disclosed their relationship with FERRETTI GROUP AMERCIA d/b/a FERRETI GROUP or FERRETTI S.p.A.

64. Despite FERRETTI S.p.A. creating a second entity [FERRETTI GROUP of AMERICA dba FERRETTI GROUP] to sell the RIVA instead of through its "exclusive dealer" [ALLIED MARINE d/b/a FERRETTI GROUP USA], ALLIED MARINE's Broker Chris

Coughlin appears on FERRETTI GROUP of AMERICA's Purchase and Sale Agreement as its "Sales Executive."

65. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share the same address of 1445 SE 16th Street, Fort Lauderdale.

66. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share the same address identified as the Ferretti Regional Office

67. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share the same corporate officers, Director, Vice President and Secretary.

68. FERRETTI GROUP of AMERICA's Purchase and Sale Agreement deceptively recites that FERRETTI GROUP of AMERICA is not a manufacturer of Yachts when in fact FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP is owned 100% by the manufacturer, with its web addresses www.ferrettigroupamerica.com and www.ferrettigroup.com registered to the manufacturer FERRETTI S.p.A..

69. The copyrights on the FERRETTI GROUP AMERICA and FERRETTI GROUP websites are registered to Ferretti S.p.A..

70. The privacy disclosures on on the FERRETTI GROUP AMERICA and FERRETTI GROUP websites refer to Ferretti S.p.A. as the collector and recipient of users' private data.

71. The FERRETTI GROUP AMERICA and FERRETTI GROUP websites contain FERRETTI S.p.A.'s VAT Number.

72. The FERREETI GROUP of AMERICA website contains direct links to FERRETI S.p.A. corporate website.

73. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP are subject to FERRETTI S/p.A.'s Control Model and Code of ethics.

74. ALLIED MARINE a supposedly separate legal entity does not even own its own Trademarks.  Instead the Trademarks are owned by FERRETTI GROUP of AMERICA HOLDING COMPANY, INC another wholly owned subsidiary of FERRETTI S.p.A.

75. FERRETTI S.p.A. includes financial results from the operations of ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP on its Financial Reports and stock prospectus.

76. The Purchase and Sale Agreement though claiming it is the seller and not the manufacturer or warrantor contains a contractual attempt to disclaim "ANY AFFIRMATION OF FACT OR PROMISE WRITTEN OR VERBAL MADE BY FERRETTI GROUP USA, OR MANUFACTURER WILL NOT BE DEEMED TO CREATE AN EXPRESS WARRANTY THAT THE YACHT WILL CONFORM TO THE AFFIRMATION OR PROMISE"  This contractual overreaching and commingling of the parties combined with the facts set forth above is clear evidence of the singular dominant mind and control over the entire   sale and warranty process by FERRETTI S.p.A. to the detriment of the consumer.

77. The scheme devised by FERRETTI S.p.A. created a joint venture between FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP.

78. The three companies are so intertwined and interolocked that they essentially indistinguishable and are one company under a single dominant mind and control.

79. FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP share common interest, common control and shared financial interests

80. FERRETTI S.p.A. permitted ALLIED MARINE to be registered as the manufacturer of the RIVA in an attempt to hide or shelter FERRETTI S.p.A. from liability associated with the yachts it builds.

81. FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP share a common purpose in the sale of vessels to consumers in the United States such as the Plaintiff. Upon information and belief FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP had joint or shared control over the aspects the venture including advertising, merchandizing, sales conditions and service of the vessel among others.

82. Upon information and belief FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP had a joint proprietary and / or ownership interest in the time and labor expended in selling, marketing and servicing vesssels in the United States.

83. Upon information and belief FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP shared in expenses, promotions advertising and or marketing of the vessels in the United States and Florida.

84. Upon information and belief FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP shared in the profits of  or mutually benefited financially from the sale and service of vessels in the United States and Florida.

85.  Upon information and belief FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP shared in the losses which may have been incurred from the sale and service of vessels in the United States and Florida.

86. At all times material hereto there was a joint venture FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP and each of the venturers acted in the course and scope of that venture with respect to the sale and marketing of the vessel to Plaintiff.

**THE PURCHASE**

87. The RIVA vessel was purchased by Kenneth Horowitz for $1,254,000.00 for personal and family use.

88. The Buyer's Closing packet was prepared and transmitted by Michelle Du Preez from ALLIED MARINE not FERRETTI GROUP on March 18, 2020.

89. The ALLIED MARINE cover letter attaching Buyer's Closing packet also included a "copy of our [ALLIED MARINE] Wire Instructions.

90. The wire transfer instructions for FERRETTI GROUP (not ALLIED MARINE) listed Michelle Du Preez as the assistant managing the wire transfer on behalf of FERRETTI GROUP of AMERICA further conflating ALLIED MARINE d/b/a FERRETTI GROUP USA with FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP.

91. The FERRETTI GROUP Privacy Policy provided to Plaintiff at time of closing was issued by the manufacturer of the boat, FERRETTI S.p.A.

92. The Warranty Card presented to Plaintiff at time of closing was captioned RIVA WARRANTY CARD. The body of the warranty card refers to a **Ferretti Yachts** Warranty which was never produced to Plaintiff. The Warranty Card provides

   "I understand that the **Ferretti Yachts Warranty** is effective only after I have completed, dated and signed this Warranty Card, and it has been received by Ferretti Group USA. I also understand that the **Ferretti Yachts Warranty** is the only warranty given by **Ferretti Yachts** and that it applies only to the boat I am purchasing identified on the Warranty Card." (emphasis supplied)

93. Plaintiff did not receive a Ferretti Yacht Warranty.

94. The Closing Packet also contained an ACKNOWLEDGMENT OF RECEIPT OF RIVA LIMITED HULL WARRANTY STATEMENT although no such RIVA LIMITED HULL WARRANTY was ever produced.

95. A Limited Warranty for the subject vessel was issued on behalf of FERRETTI S.p.A. by ALLIED MARINE, INC. doing business as business as FERRETTI GROUP USA.

96. Plaintiff accepted the RIVA based upon the reasonable assumption of Repair.

   **CONDITIONAL ACCEPTANCE OF THE RIVA**

97. On February 18, 2020 prior to closing Plaintiff signed a Conditional Acceptance of the Riva.

98. The Conditional Acceptance included the following handwritten conditions which have never been fulfilled despite the passage of 11 months.

   a. The kill switch magnet for the galley stovetop cover has not be installed. The kill switch is not functioning.

     b.  Full Day of Riva 38 Instruction at Ferretti Dock in Ft. Lauderdale – includes systems, mechanical, electronics, etc.

     c.  Full Day with Captain to transport Riva to dock in Pam Beach.  Will include use of boat and maneuvers plus docking tricks.

99. Chris Coughlin Yacht Sales Executive at ALLIED MARINE dba FERRETTI GROUP USA responded to the Conditional Acceptance stating:

> "Your handwritten notes on the Conditional Acceptance show how important these items are for you, **now please trust us**.  Ferretti Group needs the Conditional Acceptance signed as initially written without anything else besides the typed survey deficiencies to move forward." (Emphasis supplied)

100.     The Plaintiff was lulled into acceptance by the representations of Warrantor ALLIED MARINE dba FERRETTI GROUP USA. by Sales Executive Coughlin:

> "This is also going to have to be a gentleman agreement and one of the many nice things the Ferretti Group will offer as our relationship grows."

101.     Plaintiff relied upon the above representations by writing Coughlin on March 6, 2020 stating: "Based on the email you sent (which is below) I have signed the Conditional Acceptance above."

102.     Plaintiff's Trust was misplaced as ALLIED MARINE d/b/a FERRETTI GROUP USA violated the trust and did not keep its gentleman's agreement.

103.     Prior to Delivery Plaintiff wrote ALLIED MARINE d/b/a FERRETTI GROUP USA in regard to signing the ACCEPTANCE OF NEW VESSEL:

"As Chris [Coughlin] and I have discussed earlier today, I am signing for items and inspections (general due diligence) which I have not had the opportunity to personally conduct or review since the RIVA 38-51 will be delivered to me in Palm Beach sometime after you receive these documents.  Chris has assured me that based upon Ferretti/Allied Marine Customer Care high quality standards that you will honor any deficiencies I may find once I have the opportunity to explore and use the RIVA. We will also conduct an in-person review of the RIVA in Palm

Beach with a representative of Ferretti/Allied Marine at a future date. We are proceeding with this quick method of closing as we are all concerned about spreading the coronavirus to each other."

104.     The Plaintiff has revoked his conditional acceptance as the conditions have never been satisfied.

105.     The RIVA vessel was delivered to Kenneth Horowitz on or about March 20, 2020.

106.     After delivery of the vessel numerous defects were discovered which, unbeknownst to the purchaser had existed at the time of manufacture and delivery of the vessel and which rendered the vessel unseaworthy, unreliable and unsafe to operate.

**THE DEFECTS**

107.     The RIVA yacht was delivered to Plaintiff late on March 18, 2020 because the captain was required to go slow due to the Port engine overheating. Upon arrival an alarm was sounding, the engine hatch was raised to cool the engine, the RIVA exhibited various electrical problems including the analog gauges were inoperative.

108.     A punch list of defects was prepared and sent to the Warrantor. The defects included:

   a) Propeller pods would trim up for no reason.
   b) Warning of loss of steering and joystick operation shown on Garmin glass after starting engines
   c) Both engine alternators would not output any current to batteries once engines were started.
   d) Table was stuck closed.
   e) Swim platform solenoid was stuck and pump kept running an alarm going after opening.
   f) Aft bilge pump was running but not pumping water.
   g) Door to Sea Bob was crooked.
   h) Gaskets to engine room were not sealing properly.
   i) Swim platform chipped from hitting propeller pod.
   j) Sliding door to cabin scraping on trim inside helm area.
   k) Water leaking from Bimini top storage inside of cabinets.

l) Water damage to cabinet from leak
m) Toilet not flushing properly
n) Swim platform opening by itself.
o) Air conditioning would intermittently shut down and blow warm air.
p) Radio turning on by itself.

109.     The following is a non-exclusive list of operational issues and attempts to repair the defects were made by Warrantor. Missing form the list were call backs to fix repairs that were  not corrected on the first attempt:

a. Late March Propeller pods raised by itself causing the swim platform to hit the pod.

b. March 31, 2020 High engine temperature alarm.

c. April 14, 2020 when attempting to use the RIVA the propeller pod hit the swim platform due to a design failure.

d. April 16, 2020 a technician arrived to address some of the defects.  The technician reviewed the schematics of the boat for sensors on the propeller pods and damaged the stuck table when opening.

e. May 11, 2020 when attempting to use the RIVA an alarm on the control display warned of low battery power and the Interceptor voltage was low preventing use of the RIVA,

f. May 21, 2020 Plaintiff expressed concern over the inablility of the RIVA's alternators to keep batteries charged.  Plaintiff wrote Warrantor's representative, "Its scary wondering whether I'm going to have an engine start problem after we anchor multiple times."  The warranty representative texted, "I agree,"

g. May 21, 2020 The Warranty representative spoke with the Warranty manager and replied to Plaintiff stating "He's actively engaged in a fact finding mission between the electrician, Volvo and the shipyard."  The Warranty representative also spoke with the "US Riva rep to communicatate your message."

h. May 21, 2020 Plaintiff threatened litigation if situation was not corrected.  The Warranty representative acknowledged the Plaintiff's position was communicated "to FG."

i.   May 22, 2020 Warrantor's electrician found voltage was dropping and found neither alternator was charging the batteries.

j.   May 29, 2020 Volvo Penta techs and Electrician on board to correct electric issues.

k.   May 30 a trip to watch the SpaceX launch offshore with friends was aborted due to the pods trim system malfunctioning. The starboard pod stuck at +24° with the port pod stuck at -4° preventing use.

l.   May 30, 2020 Plaintiff writes the ALLIED MARINE's Warranty Manager, "We lost the ablility to control the Starboard props and stuck in up position. . . . Nicola, it seems almost every time I try to enjoy the boat something electrical happens."

m.  June 9, 2020 Warrantor sent carpenter to remove the damaged table for repair.

n.   June 12, 2020 Warrantor sent Volvo tech to investigate non-functioning trim tabs and motor podswho was not able to correct problem. In addition the Engine tech was waiting on wiring diagrams and schematics from manufacturer to fix the charging system. There were three unsuccessful attempts to repair which left the boat unable to operate.  Warrantor modified the electrical system permitting the generator while operating the boat to keep the batteries charged as the alternators did not charge the batteries.  Owner chose not to put his family at risk with the unsafe workaround.

o.   June 16, 2020 Engine repairer received wiring schematics but not able to correct problem for two weeks.

p.   June 18, 2020 Electricians arrive at boat with wiring schematics and found two wiring errors from when the boat was constructed in Italy.  The electricians corrected the wiring errors but still no output from the alternators.

q.   June 22, 2020 Warrantor's manager and electricians still investigating electrical issues and found inoperative fuse caused by previous repairer prevented operation.

r.   July 6, 2020 Air conditioning blowing warm air.

s.   July 8, 2020 Air conditioning still not working.

t.   July 9, 2020 Warrantor is attempting to provide an Air conditioning technician.

u.   July 10, 2020 the Volvo Penta Glass Cockpit System displayed voltage fault and steering servo errors and joystick control errors causing Plaintiff to cancel trip to Florida to use boat with son.

v.  July 10, 2020 Plaintiff requests replacement boat from Warrantor due to major electrical issues.

w.  July 13, 2020 Volvo technicians diagnosed issues and corrected the error warning.

x.  July 13, 2020 Air conditioner technician unsuccessfully attempted repair.  Tech returned and found mis-wired sensor.

y.  July 23, 2002 Sump for air conditioning drain was not working – owner remedied.

z.  July 27, 2020  Sump for air conditioning drain was not working – owner remedied.

aa. Between July 30 and September 30, 2020 the boat was in dry storage for the hurricane season.  Warrantor made no efforts to correct problems during this period.

bb. October 1, 2020 Swim platform alarm and pump would not shut off.

cc. Mid October Technician arrived to correct the problem by spraying silicon of the solonoids.

dd. October 29, 2020 technician installed check valve for the aft bilge pump. Adjusted Sea Bob Garage. Installed additional gaskets for the engine hatches to make the hatches seal properly to prevent water ingestion into the machinery spaces and repaired the air-conditioning drain pump.

ee. December 1, 2020 Plaintiff speaks with Ferretti's Managing Director for the Americas to complain about the delay and inability to get the RIVA operational. Ferretti's Managing Director said the "wait is ridiculous."

ff.  December 19, 2020 Attempted trip with guests aborted when swim platform started opening by itself creating dangerous conditions to operate the RIVA.  The air conditioning failed to start. The radio turned on and off by itself signifying electrical fault. Water was found accumulating in the starboard cabinet.

gg. December 21, 2020 Technician attempted repair of air conditioner. The technician found the port helm dashboard control switches were corroded due a design defect allowing water intrusion into switch housing. Discovered water channels into cabinets when Bimini top is used.  Finish on interior cabinet damaged due to water instructions. Found sliding cabin door is scoring when opening as internal obstruction is scraping the surface of the door.  Attempted repair of misfunctioning toilet.

hh. December 22, 2020 Technician returned to repair the air conditioning.

    ii.   December 22, 2020 A second technician arrived to replace 5 of the 13 corroded switches. for control of swim platform and Bimini top.  The technician could not replace remainder of control switches necessary for safe navigation of the vessel. To date neither the Warrantor nor the manufacturer has replaced the 8 remaining switches. Could not repair sliding door. Could not correct water intrusion problem caused by Bimini top.  Advised builder intervention was required. Radio continued to turn on without human intervention.

110.    Warrantor did not return to repair any of the unresolved issues after December 22, 2020.

111.    On January 1, 2021 Plaintiff sent written notification to Warrantor and Seller of Revocation of Acceptance and intent to rescind the contract due to among other reasons that fact the electrical issues have required the vessel to be shut down while underway creating a serious life and safety hazard. The swim platform spontaneously lowered while the vessel was in operation resulting on the boat limping home, control switches fail and corrode due to a combination of water instruction and stray current.

112.    The January 1, 2021 notice also informed the Warrantor and Seller the vessel was unreliable, unmerchantable, unseaworthy and non-conforming to industry standards and their failure to repair, replace the defective vessel or provide a refund.

113.    In response to the demand, Warrantor, Seller and manufacturer sent its warranty manager to inspect the boat.  The warranty manager did not energize the electrical system spending only 18 minutes to address the defects contained in the January 1, 2020 demand letter.

114.    On January 26, 2012 the Seller responded denying the vessel was unmerchantable, unseaworthy and non-conforming to industry standards.  The Seller wrote " Ferretti Group

believes the Yacht is fine and apart from the few open items that Ferretti Group commits to address, the Yacht does not present any serious issues."

115.     During the eleven month period of ownership the RIVA has been operated less than 22 hours with most of the hours attributed to sea trials and testing rather than personal use.

116.     The RIVA yacht continues to display error codes and messages when attempting to operate the vessel or other mechanical or electrical issues arises during attempted operation requiring the boat to either remain at dock or to return to dock.

117.     During the eleven month period of ownership of the RIVA, ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP has been aware of the various issues plaguing the RIVA.

118.      During the eleven month period of ownership the RIVA has been serially under repair addressing various issues but without resolution of all of the issues preventing safe and reliable operation of the RIVA.

119.     Plaintiff has advised the Defendants of the defects and afforded them substantial opportunity to cure or repair the defects, but Defendants have been unable or unwilling to rectify and repair the problems.

120.     Plaintiff has not had reasonable use of the boat for normal cruising enjoyment during the eleven months period of ownership.   The engines have logged only 22 hours of operation (not cruising) while owner was on board with serious operational problems occurring for a majority of the hours.

**CURRENT UNCURED DEFECTS**

121.     Aft Engine hatches do not seal in contravention of ABYC H-3 standard allowing rain water ingress onto the engines. This has resulted in damage to both engines. Due to

the critical nature of the engines, electrical panels, generator, etc these aft engine room hatches should be water tight and to achieve this would require significant modifications that would change the function and the cosmetic appearance of these hatches. There have been failed attempts to repair this problem.

122.     Forward machinery space hatch does not seal in compliance with ABYC H-3 standard. The failure to seal allows rain water ingress that falls directly onto the Sea Keeper causing water damage to this component. Seakeeper is now tripping breaker and will not activate.

123.     Air conditioning was found installed in the forward machinery space. The evaporator is in the forward machinery space which is subject to carbon monoxide. Air from the V-berth cabin circulates through the forward machinery space and if there are any leaks in the ductwork can potentially introduce dangerous carbon monoxide gases to the cabin. This should be considered a safety issue and the re-circulation of air in the V-berth Cabin should be contained within the V-berth cabin to prevent any potential safety problems. The AC system should not be inside the machinery space. To rely on the integrity of a flexible duct and exhaust systems presents a safety issue that can result in serious health problems and/or death.

124.     Bimini top storage compartment does not seal or properly drain allowing rain water ingress to fall directly adjacent to the generator in the aft machinery space. This cover is not a hatch and is exposed to the environment. The design actually funnels the accumulated rainwater toward the actuator for the compartment. A fixed piece that is also fitted with a Velcro canvas cover is supposed to prevent this accumulated rain water from entering the aft machinery space but it does not. The poorly sized drains located Port &Starboard

corners are about ¼" in opening and easily clog. The rainwater accumulates and seeps underneath and over this rain dam and into the aft machinery space presenting a safety hazard.

125.     In the same area referenced in the paragraph above and associated with the mechanical actuators for the Bimini top. The Port &Starboard hinges and actuators communicate with the storage compartments on the Port &Starboard sides of the cockpit area. The actuators are exposed to the environment and have allowed for rainwater to enter the storage compartments. This has caused water damage to the wood finish, cooler, hinges and runners. This is a poor design. The actuators need to be isolated from the storage compartments and this will require significant modifications to correct.

126.     The cockpit has bench seating with storage compartments below. The bench seating is exposed to the environment and is subject to wind & rain. All are fitted with drains except for the compartment that is fitted with the emergency Whale gusher pump and the valves to the bilge pumps. There are no drains in this compartment. The bilge pump valve manifold penetrates the compartment and communicates with the forward machinery space. The hatch cover for this compartment is not watertight. When water accumulates to a level was about about 1 inch, water started to pour into the forward machinery space onto the fresh water pump and the Sea Keeper sea water cooling pump. This is a poor design presenting a safety hazard.

127.     The Volvo DUO prop outdrives when trimmed up will hit the bottom forward edge / hinge of the swim platform. The cavitation plate of the outdrives & bottom edge of the swim platform have an interference with each other. To lower the aft swim platform the outdrives have to be trimmed down otherwise there will be physical contact and damage.

This is a design defect. There are no alarms to warn of this problem.

128.    The sliding hatch for the V Berth Cabin sits on tracks and slides into a pocket when open that is behind the main helm. The surface of the hatch is visibly scratched in several areas from contact.  There are clear problems by the noise from the hatch when moved. The sliding hatch is flawed in function. There is no access panel behind the helm station. The electronics and wiring were exposed to the sliding surface of the hatch and making contact. The hatch is also exposed to wind & rain. The design of this hatch will expose the backside of the electronics to rain water. This arrangement is a design flaw that until corrected will continue to reoccur and continue to cause damage to the hatch and the electronics.

129.    The boat is fitted with (2) machinery spaces. Forward & Aft. Both spaces are fitted with fire suppression systems that appear to be sized for the compartment. The flaw is that both compartments communicate with each other, hatches do not seal and we did not see any dampers on the air inlets to the machinery space.  The two fire suppression bottles as rigged do not appear that both would simultaneously discharge as required by ABYC 4.8.10.5.

130.    The single burner electric stove in the galley does not meet A-3 Galley stove standards as there was insufficient clearance for the overhead cabinet which was constructed of wood.

131.    The head (toilet) 120 volt receptacle ground fault circuit interrupter is a ten milliampere device and does not adequately protect personnel from shock and electrocution.

132.     The 120/240 volt AC generator is undersized for the vessel loads (generator is rated for 31.3 amperes output current; Seakeeper and air conditioning specifications exceed this value. Other AC loads are also on the panel (water heater specifications were not sighted).

133.     The battery charger output rating does not appear to be adequate to keep up with the 12 volt loads when operating with a full complement of guests.

134.     A battery charger DC grounding conductor is not installed. Battery positive fault to the charger chassis will result in an electrical fire.

135.     Accelerated corrosion damage to electrical switches in the control station port switch section is evident. This condition exhibits conclusive evidence of saltwater intrusion behind this panel.

a. Some of the switches appear to brand new (i.e., not exhibiting corrosion damage) Five of the switches have reportedly been replaced.

c. The electrical terminals connected to some of the new switches still exhibit evidence of water intrusion and corrosion damage.

d. This switch panel includes Seakeeper gyro stabilizer control panel, steering control harness connections, data network cable connection, an unidentified audible alarm.

e. Based on the condition of the switches that have not yet been replaced, the reliability of all other devices in this panel void cannot be assured.

136.     A control lever failure alarm sounds upon activation of the engine controls with a display message indicating that a Volvo Penta repair facility should be contacted as soon as possible. Volvo Penta has made service calls yet faults still exist. The engine control

lever and the associated connections are in the areas of the previously mentioned water intrusion.

137.     Numerous sporadic failures or malfunctions of various vessel control systems (outdrive hydraulics, swim platforms, stereo, engine alarms. The Bimini top obscures the navigational anchor light from the rear side of the vessel.

138.     The shore power inlet enclosure drain does not appear to be large enough to adequately drain water during heavy rain or water washing over the stern. Flooding and partial submersion of the shore power cord 240 volt connection are likely to occur.

139.      The shore power cord end cover sealing ring is not installed, which significantly degrades the water tight integrity of the shore power cord end to the shore power inlet connection.

140.     The engine room shore power inlet circuit breaker short circuit interrupting capacity is inadequate.

141.     Shore power inlet ELCI (equipment leakage circuit interrupter) protection is not fitted. ELCI help to prevent electrocution and electric shock drowning.

142.     The main cabin circuit breaker panel 120/240 volt main RCCB (residual current circuit breaker) is rated for 400 volts 50 hertz three phase operation and is not rated for the connection scheme (single phase 120/240 volt 60 hertz operation).

143.     The AC distribution neutral conductor from the engine room contactor enclosure to the circuit breaker panel located in the cabin is composed of undersized conductors connected in parallel rather than composed of a single adequately sized conductor.

144.     The main cabin circuit breaker panel 240 volt AC circuits are not segregated from the 12 VDC circuits.

145.     The air conditioning circuit breaker is a ten ampere device despite the equipment manufacturer specification that the minimum fuse size should be twelve amperes.

146.     The Gyro stabilizer circuit breaker is a 20 ampere device despite the equipment manufacturer specification plate indicating a 25 ampere current draw.

147.     The main engine alternators show evidence of water intrusion and corrosion damage associated with water intrusion through the hatches.

148.     Engine room cathodic bonding conductor connections have been made below the level of normal accumulated bilge water.

149.     The 12 volt lighting circuit breakers do not appear to be properly sized for the various applications.

150.     A bow thruster DC grounding conductor is not installed. A battery ground fault could result in catastrophic electrolytic stray current.

151.     Battery bank ventilation is not installed. Any vented hydrogen gas will exhaust into the engine room.

152.     The services battery wiring runs are composed of two undersized conductors rather than a single conductor rated for 400 ampere service.

153.     The swim platform control and outdrive lift functions are not interlocked. This is a design defect.

154.     The forward engine space ventilation extractor does not appear functional.

155.     Forward of the chain locker a small oval drain. The purpose of the drain is to prevent water from flowing onto the foredeck.  This drain is exposed and like the other drains on the boat is frequently plugged with debris and allows for rainwater to accumulate and cause damage. In this area of the bow the deck slopes down.  The rub rail is higher

than the sloping deck and when the drain is plugged with debris the rainwater puddles allowing the Stainless Steel trim and wood decks to be soaked. This has started to discolor the materials and will quickly cause damage to the area. Like the other drains on this boat they are poorly designed and inadequate and do not meet their purpose.

156.    The RIVA continues to exhibit electrical faults and other error codes whenever starting the engines.

157.    The Warrantor has not replaced eight of the corroded switches which control vital functions of the RIVA.

158.    The RIVA continues to be unreliable and unsafe despite the efforts of Ferretti.

159.    The RIVA is unsafe and unfit by any standard.

160.    Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3).

161.    Defendant FERRETTI S.p.A. is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2304(4) and (5).

162.    Defendant FERRETTI S.p.A. is a merchant and seller of the vessel and goods of the kind of the vessel re within the contemplation of Fla. State 672.314 *et seq*.

163.    Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA, is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2304(4) and (5).

164.    Defendant FERRETTI GROUP OF AMERICA, LLC.d/b/a FERRETTI GROUP is a "supplier" as defined in 15 U.S.C. § 2304(4) and (5).

165.    Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA, is a merchant and seller of the vessel and goods of the kind of the vessel re within the contemplation of Fla. State 672.314 *et seq*.

166.     Defendant FERRETTI GROUP OF AMERICA, LLC.d/b/a FERRETTI GROUP is a merchant and seller of the vessel and goods of the kind of the vessel re within the contemplation of Fla. State 672.314 *et seq.*

167.     Defendant FERRETTI S.p.A is the manufacturer and Warrantor.

168.     Defendant ALLIED MARINE dba FERRETTI GROUP USA is a manufacturer of the RIVA.

169.     The 2020 Riva 38-51is a "consumer  product" as defined in 15 U.S.C. §2301.

**MARKETING OF THE RIVA**

170.     The RIVA was marketed as a like living on your personal private island to enjoy moments with your loved ones in "total safety."  Ferretti advertised:

### Your private island

Owning a yacht is like living on your personal private island. A place with no limits, where you can enjoy unique moments with your loved ones in total safety and privacy. A yacht is like a private island that moves with you. Allowing you to explore new places every day in absolute freedom, whenever you want. And a yacht is a safer place to be than any 5-star hotel or luxury resort. Choosing to become a yacht owner means choosing to invest in your wellbeing and peace of mind. Your yacht as your own private island, where you are the ultimate VIP.

171.     The Plaintiff's expectation was that his his RIVA would permit him to "explore new places every day in absolute freedom" and would be "a safer place" than any 5-star hotel."  The yacht was marketed to invest in "wellbeing and peace of mind."

172.     The defects in the RIVA prevented the Plaintiffs the level of enjoyment and expection that comes with the ownership of a new luxury Italian yacht.  The defects rendered the RIVA unsafe  and incapable of being operated reliably to "explore new places."

173.    Plaintiff had less than 22 hours use of the RIVA due to operational, manufacturing and design defects.

174.    Plaintiff has not received the benefit of the bargain.

175.    The FERRETTI GROUP USA Warranty fails at its essential purpose.

176.    FERRETTI S.p.A. advertised and marketed its vessels, such as the subject vessel, to consumers located in the United States and, specifically in Florda and in Broward County.

177.    ALLIED MARINE INC., doing business as FERRETTI GROUP USA advertised and marketed is vessels, such as the subject, vessel to consumers located in the United States and, specifically in Florda and in Broward County.

178.    Defendant FERRETTI GROUP OF AMERICA, LLC.d/b/a FERRETTI GROUP advertised and marketed is vessels such as the subject vessel to consumers located in the United States and, specifically in Florda and in Broward County.

179.    Plaintiff performed all conditions precedent to this action or the conditions have occurred.

180.    Plaintiff must act at this time because the Warrenty issued by ALLIED MARINE d/b/a FERRETTI GROUP USA requires legal remedies be sought within one year. The Warranty provides:

> "legal claims relating to any alleged problem with this Yacht will be barred unless suit is commenced within one (1) year from the date the cause of action accrues, regardless of the time remaining in the applicable warranty period."

181.    The Warranty contains a good faith requirement upon the consumer.

> It is Owner's obligation to fully cooperate with FERRETTI to allow repair or replacement as provided above, and the failure to cooperate in good faith will void this warranty.

182.     It is a tenant of Florida law that such obligations are reciprocal in nature. The Warrantor breached the Warranty due to its bad faith.

## COUNT I
## BREACH OF WARRANTY AS TO ALLIED MARINE dba FERRETTI GROUP USA - THE WARRANTY FAILS OF ITS ESSENTIAL PURPOSE

183.     The allegations contained in paragraphs 1 through 182 above are realleged and incorporated as if fully stated herein.

184.     Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA.

185.     ALLIED MARINE d/b/a FERRETTI GROUP USA was the Warrantor as it issued the written FERRETTI GROUP USA LIMITED WARRANTY (FOR RIVA YACHTS).

186.     The Warrantor, ALLIED MARINE d/b/a/ FERRETTI GROUP USA. had eleven months to repair or replace the defective components of the RIVA without success.

187.     Plaintiff has advised the Warrantor of the defects and afforded them an opportunity to cure or repair the defects but Defendants have been unable or unwilling to rectify and repair the problems described in paragraphs 107 to 157 above.

188.     A reasonable or seasonable time period to rectify the defects has expired.

189.     The boat is unreliable and unsafe in its current condition.

190.     Plaintiff is unable to use the boat as advertised and intended as a place "where you can enjoy unique moments with your loved ones in total safety . . . allowing you to explore new places" bringing "wellbeing and peace of mind."

191.     Plaintiff has had less than 22 hours use of the boat with most of the enjoyment curtailed by operational defects and safety issues.

192.     The warranty restrictions, disclaimers and/or limitations contained in the warranty are unconscionable under Florida Statute § 627.302, et seq., ineffective under the MMWA, 15 U.S.C. § 2301, et seq., violate FTC rules interpreting the MMWA, and violate Defendants, duty of good faith imposed under the Uniform Commercial Code and as a matter of law.

193.     Florida Statue 672.719 (2) provides "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Code."

194.     The Comment 1 to section 2-719 explains the policy behind this section:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus . . . where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

195.     Failure of the warranty to meet its essential purpose because of the Warrantor's failure of inability to repair the RIVA provides plaintiff with the general remedy under the UCC which includes Refund or Revocation of Acceptance.

196.     The exclusive remedy under the ALLIED MARINE d/b/a FERRETTI GROUP USA Warranty of repair or replace fails in its essential purpose because the repair or replacement of only certain items, does not satisfy the purpose of rectifying defects of the subject vessel under the circumstances of this case where the entire vessel is effectively rendered defective, unreliable, unmerchantable, nonconforming, unfit, unseaworthy, dangerous and unrepairable.

197.      In addition the wararnty provides that the determination of defect and remedy of the defect is at the sole discretion of the Warrantor in violation of the the MMWA.

198.      The limitation on remedies further render any warranty offered by ALLIED MARINE d/b/a FERRETTI GROUP USA is illusory, depriving Plaintiff of reasonable protections against breach and the fair quantum of remedies guaranteed by the Uniform Commercial Code

199.      As a result of the foregoing Plaintiff has sustained damages and is entitled to relief under the Uniform Commercial Code including but not limited to actual damages as well as consequential and incidental damages.

200.      The warranty offered by Defendant, ALLIED MARINE d/b/a FERRETTI GROUP USA violates the requirements of the MMWA, 15 U.S.C. § 2301*, et seq.*, entitling Plaintiff to remedies thereunder.

201.      Accordingly, Plaintiff may resort to all remedies under the MMWA, the Uniform Commercial Code and common law including refund and direct, consequential and incidental damages.

**WHEREFORE**, Plaintiff demands judgment against ALLIED MARINE d/b/a FERRETTI GROUP USA for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees pursuant to the Florida Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such other and further relief that this Honorable Court deems just and proper.

## COUNT II
## BREACH OF WARRANTY AS TO FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP AS JOINT VENTURERS

202.     The allegations contained in paragraphs 1 through 182 above are realleged and incorporated as if fully stated herein.

203.     Plaintiff has privity with ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP.

204.     Plaintiff has privity with FERRETTI S.p.A., as ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP are agents for FERRETTI S.p.A.

205.     FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers with respect to the sale, distribution and service of the vessel were jointly obligated under the warranty issued to Plaintiff for the vessel.

206.     FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP had eleven months to repair or replace the defective components of the RIVA without success.

207.     Plaintiff has advised the FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP of the defects and afforded them an opportunity to cure or repair the defects but Defendants have been unable or unwilling to rectify and repair the problems described in paragraphs 107 to 157 above.

208.     A reasonable or seasonable time period to rectify the defects has expired.

209.     The boat is unreliable and unsafe in its current condition.

210.     Plaintiff is unable to use the boat as advertised and intended as a place "where you can enjoy unique moments with your loved ones in total safety . . . allowing you to explore new places" bringing "wellbeing and peace of mind."

211.     Plaintiff has had less than 22 hours use of the boat with most of the enjoyment curtailed by operational defects and safety issues.

212.     The warranty restrictions, disclaimers and/or limitations contained in the warranty are unconscionable under Florida Statute § 627.302, et seq., ineffective under the MMWA, 15 U.S.C. § 2301, et seq., violate FTC rules interpreting the MMWA, and violate Defendants, duty of good faith imposed under the Uniform Commercial Code and as a matter of law.

213.     Florida Statue 672.719 (2) provides "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Code."

214.     The Comment 1 to section 2-719 explains the policy behind this section:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus . . . where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

215.     Failure of the warranty to meet its essential purpose because of the Defendants failure of inability to repair the RIVA provides plaintiff with the general remedy under the UCC which includes Refund or Revocation of Acceptance.

216.     The exclusive remedy under the Warranty of repair or replace fails in its essential purpose because the repair or replacement of only certain items, does not satisfy the purpose of rectifying defects of the subject vessel under the circumstances of this case where the entire vessel is effectively rendered defective, unreliable, unmerchantable, nonconforming, unfit, unseaworthy, dangerous and unrepairable.

217.     In addition the wararnty provides that the determination of defect and remedy of the defect is at the sole discretion of the FERRETTI in violation of the the MMWA.

218.     The limitation on remedies further render any warranty provided to Plaintiff  is illusory, depriving Plaintiff of reasonable protections against breach and the fair quantum of remedies guaranteed by the Uniform Commercial Code

219.     As a result of the  foregoing Plaintiff has sustained damages and is entitled to relief under the Uniform Commercial Code including but not limited to actual damages as well as consequential and incidental damages.

220.     The warranty offered by Defendants, further violates the requirements of the MMWA, 15 U.S.C. § 2301, *et seq.*, entitling Plaintiff to remedies thereunder.

221.     Accordingly, Plaintiff may resort to all remedies under the MMWA, the Uniform Commercial Code and common law law including refund and direct, consequential and incidental damages.

**WHEREFORE**, Plaintiff demands judgment agaomst FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint ventureres for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys'

fees pursuant to the Florida Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such other and further relief that this Honorable Court deems just and proper.

## COUNT III- REVOCATION OF ACCEPTANCE
## FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP

222.    The allegations contained in paragraphs 1 through 182 above are realleged and incorporated as if fully stated herein.

223.    The cause of action alleged in this Count is brought pursuant to the MMWA, 15 U.S.C. § 2301, *et seq*.

224.    Prior to purchase, at delivery and after delivery, Defendants represented to Plaintiff that the subject vessel was capable, suitable, appropriate and free of defects for the use intended by Plaintiff as a recreational vessel.

225.    After acceptance of delivery of the vessel, Plaintiff learned that the vessel was not designed, constructed, fabricated, manufactured or assembled as warranted.

226.    The subject vessel fails to conform due to the existence of defects in material, design, construction, workmanship, fabrication, manufacturing and assembly as more particularly set forth above in paragraphs 121 to 157.

227.    The nonconformity and deficiencies in material, design, construction, workmanship, fabrication, manufacturing and assembly are significant and have directly and substantially impaired the value of the vessel.

228.    Plaintiff has been denied the benefit he bargained for when purchasing vessel. Plaintiff has not have the benefit of the use of the RIVA.  Plaintiffs was simply not sold the goods they bargained for and have, therefore, been damaged to the full extent of the

purchase price, consequential and incidental costs, as well as attorney's fees pursuant to statute.

229.    Plaintiff relied upon the representations from Defendants  that they would honor the warranty commitments and Conditional Acceptance items and repair or replace the vessel and any defects in materials or workmanship as identified herein, to permit the vessel to operate as a recreational vessel.

230.    Defendants have not satisfied the conditions set forth on the Conditional Acceptance as described in paragraphs 98 to 106.

231.    Notice of the finding of the vessel's defects was provided to Defendants within a reasonable time after the discovery of the defects.

232.    Defendants have  had sufficient opportunity to cure but failed to cure the defects in the vessel.

233.    As a direct and proximate result of the failure to satisfy contractual obligations and the nonconformity and deficiencies in design, construction, fabrication, manufacturing and or assembly of the vessel, Plaintiff has elected to revoke its acceptance of a non-conforming subject vessel and seeks return of its purchase price, as well as actual, direct, consequential, incidental, and reliance damages which include but are not limited to the purchase price of the subject vessel, together with prejudgment interest, costs, and attorneys' fees pursuant to the MMWA, 15 USC § 2310(d).

**WHEREFORE**, Plaintiff demands judgment against FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees pursuant to the Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such

other and further relief that this Honorable Court deems just and proper.

## COUNT IV
## BREACH OF EXPRESS WRITTEN WARRANTY against ALLIED MARINE dba FERRETTI GROUP USA

234.     The allegations contained in paragraphs 1 through 182 above are realleged and incorporated as if fully stated herein.

235.     Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA.

236.     ALLIED MARINE d/b/a FERRETTI GROUP USA was the Warrantor as it issued the written FERRETTI GROUP USA LIMITED WARRANTY (FOR RIVA YACHTS).

237.     Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA individually and as agent of FERRETTI S.P.A. expressly warranted to repair or replace all defects in items manufactured by FERRETTI S.p.A and to repair or replace all defects in the Yacht's hull and fiberglass structural components in the boat purchased by Plaintiff.

238.     Plaintiff discovered numerous defects in the materials and workmanship of vessel, including, but not limited to defects in the hull, engines, electrical system and fittings and other equipment on the vessel.

239.     All defects described above in paragraphs 107 to 157 were covered items under the terms of the express written warranty.

240.     After discovering the defects, Plaintiff contacted Defendant on numerous occasions within the warranty period and requested that the defects be repaired or replaced.

241.     As required by Defendant's warranty procedures, Plaintiff cooperated fully with FERRETTI  to allow repair or replacement of the defects

242.      Defendant and/or the agents or representatives of Defendant inspected and attempted to perform repairs on the warranted defects, but were unable to correct the problems after numerous attempts.

243.      Defendant had a reasonable opportunities to correct the defects in the materials and workmanship of the vessel  but failed to do so.

244.      Alternatively, the Defendant refused to honor the warranty and recognize warranty claims.

245.      The action of Defendant in refusing and continuing to refuse to correct the defects in the materials and workmanship constitute a breach of the express warranty covering the vessel and is a violation of the Magnuson Moss Warranty Act.

246.      Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA, refused or was unabile to  repair  the warranted defects in a reasonable time, failed to repair warranted defects after a reasonable number  of attempts, or failed to honor the express written warranty.

247.      As a result of Defendant's breach of the express warranty, it has become necessary for Plaintiff to retain the undersigned attorneys and has incurred and continues to incur legal fees, costs, and expenses in relation to this lawsuit.

248.      As a result of Defendant's failure to honor the terms of the express written warranty, Plaintiff has sustained damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA, for damages under the Uniform Commercial Code and MMWA, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' and any other relief permitted by law.

**COUNT V**

**BREACH OF EXPRESS WARRANTY AS TO FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP AS A JOINT VENTURERS**

249.    The allegations contained in paragraphs 1 through 174 above are realleged and incorporated as if fully stated herein.

250.    Plaintiff has privity with ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP.

251.    Plaintiff has privity with FERRETTI S.p.A., as ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP are agents for FERRETTI S.p.A.

252.    FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers with respect to the sale, distribution and service of the vessel were jointly obligated under the warranty issued to Plaintiff for the vessel.

253.    Defendants FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers expressly warranted to repair or replace all defects in items manufactured by FERRETTI S.p.A  and to repair or replace all defects in the Yachts hull and fiberglass structural components in the  boat purchased by Plaintiff.

254.    Plaintiff discovered numerous defects in the materials and workmanship of vessel, including, but not limited to defects in the hull, engines, electrical system and fittings and other equipment on the vessel.

255.     All defects described in paragraphs 107 to 157 above were covered items under the terms of the express written warranty.

256.     After discovering the defects, Plaintiff contacted Defendant FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers on numerous occasions within the warranty period and requested that the defects be repaired or replaced.

257.     As required by Defendant's warranty procedures, Plaintiff cooperated fully with the Joint Venturers to allow repair or replacement of the defects

258.     Defendants FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers and/or the agents  or representatives of Defendant inspected and attempted  to perform  repairs  on  the  warranted  defects,  but  were  unable  to  correct  the problems after numerous attempts.

259.     Defendants FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers have had a reasonable opportunities to correct the defects in the materials and workmanship of the vessel  but failed to do so.

260.     Alternatively, the Defendants refused to honor the warranty and recognize warranty claims.

261.     The action of Defendants in refusing or inability to correct and continuing to refuse or inability to correct the defects in the materials and workmanship constitute a breach of the express warranty covering the vessel and is a violation of the Magnuson Moss Warranty Act.

262.     Defendants Defendant FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers failed to  repair  the warranted defects in a reasonable time, failed to repair warranted defects after a reasonable number of attempts, or failed to honor the express written warranty.

263.     As a result of Defendants' breach of the express warranty, it has become necessary for Plaintiff to retain the undersigned attorneys and has incurred and continues to incur legal fees, costs, and expenses in relation to this lawsuit.

264.     As a result of Defendants' failure to honor the terms of the express written warranty, Plaintiff has sustained damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant Defendant FERRETTI S.p.A., ALLIED MARINE D/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP as joint venturers for damages the under Uniform Commercial Code and MMWA, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees and any other relief permitted by law.

## COUNT VI
## BREACH OF IMPLIED WARRANTY OF MECHANTIBILITY
## FERRETTI S.P.A., ALLIED MARINE INC., doing business as FERRETTI GROUP USA

265.     The allegations contained in paragraphs 1 through 182 above are realleged and incorporated as if fully stated herein.

266.     Plaintiff has privity with ALLIED MARINE D/B/A FERRETTI GROUP USA.

267.      Plaintiff has privity with FERRETTI S.p.A., as ALLIED MARINE D/B/A FERRETTI GROUP USA is agent for FERRETTI S.p.A.

268.     FERRETTI S.P.A., and ALLIED MARINE INC., doing business as FERRETTI GROUP USA are suppliers of the RIVA.

269.     At all times material hereto FERRETTI S.P.A., and ALLIED MARINE INC., doing business as FERRETTI GROUP USA, acted in concert to effectuate the sale and distribution of vessels in the United States and particularly in Florida which were manufactured by FERRETTI S.P.A.

270.     FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP USA individually and as agent of FERRETTI S.P.A entered into an agreement for the sale of consumer goods to the Plaintiff. That agreement provided for issuance of a written warranty for the vessel by the manufacturer.

271.     Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA individually and as agent of FERRETTI S.p.A issued the manufacturers written warranty required by the purchase and sale agreement.

272.     Plaintiff has privity with Defendant ALLIED MARINE INC., doing business as FERRETTI GROUP USA individually and as agent of FERRETTI S.p.A and FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP and FERRETTI S.p.A. as described in paragraphs 5 through 86.

273.     Under Florida Law implied in every contract for the sale of goods is a warranty of merchantability.

274.     FERRETTI S.p.A., ALLIED MARINE INC., doing business as FERRETTI GROUP USA, and FERRETTI GROUP OF AMERICA, LLC dba FERRETTI GROUP are suppliers, manufacturers and warrantors as those terms are defined by 15 U.S.C. § 2301.

275.     As suppliers of consumer goods, the Defendants are precluded by law from disclaiming the implied warranty of merchantability where a written warranty is issued. Any disclaimer of  the implied warranties are ineffective as a matter of law. 15 U.S.C. § 2308.

276.     The vessel was delivered with defects including, but not limited to defects in the hull, paint, engine, electrical system and fittings and other equipment on the vessel rendering it unmerchantible.

277.     Plaintiff contacted Defendants. through its representatives and advised Defendants of the defects in the vessel.

278.     Defendants. FERRETTI S.P.A., and ALLIED MARINE INC., doing business as FERRETTI GROUP USA, breached the implied warranty of merchantability by manufacturing and supplying the yacht which was defective and not fit for the ordinary purposes for which it was to be used.

279.     Plaintiff has incurred damage as a result of  FERRETTI S.P.A., and ALLIED MARINE INC., doing business as FERRETTI GROUP USA, breach  of  the  implied warranties of merchantability and fitness; has lost the use of the vessel and incurred or will incur expenses for the repair, reconstruction, replacement, and completion of the work and all reasonable costs related thereto.

**WHEREFORE,** Plaintiff demands judgment against FERRETTI S.P.A., and ALLIED MARINE INC., doing business as FERRETTI GROUP USA for damages, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees and any other relief permitted by law.

*By:/s Christopher R. Fertig*
CHRISTOPHER R. FERTIG, ESQ.
Florida Bar No.: 218421
chris.fertig@fertig.com
DARLENE M. LIDONDICI, ESQ.
Florida Bar No.: 516521
dml@fertig.com
FERTIG & GRAMLING
200 S.E. 13th Street
Fort Lauderdale, FL 33316
Telephone: 954-763-5020
Facsimile: 954-763-5412
*Counsel for Plaintiff*