IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 21-CV-60358-RKA

KENNETH HOROWITZ as ASSIGNEE of
UNDERWATER EXPLORATION COMPANY INC.,

     Plaintiff,

vs.

ALLIED MARINE, INC. a/k/a FERRETTI GROUP USA, INC.
a/k/a FERRETTI GROUP USA, and
FERRETTI GROUP OF AMERICA, LLC a/k/a FERRETTI GROUP,

     Defendants.

_____/

## AMENDED COMPLAINT

**COMES NOW** the Plaintiff, KENNETH HOROWITZ as ASSIGNEE of

UNDERWATER EXPLORATION COMPANY INC. ("Plaintiff"), by and through

undersigned counsel, and sues Defendants, ALLIED MARINE, INC. a/k/a FERRETTI

GROUP USA, INC. a/k/a FERRETTI GROUP USA (herein, "ALLIED MARINE" and

ALLIED MARINE d/b/a FERRETTI GROUP USA"), and FERRETTI GROUP OF

AMERICA, LLC a/k/a FERRETTI GROUP (herein "FERRETTI GROUP OF AMERICA"),

and alleges:

## PARTIES AND JURISDICTION

1.     This is an action for breach of express and implied warranties pursuant to the

Magnuson Moss Warranty Act, 15 U.S.C. § 2301, et al. in an amount exceeding $50,000 and for

Revocation of Acceptance under Florida Statute § 672.608 in an amount exceeding $75,000.00.

2.     This is an action that is within the jurisdiction of this Court pursuant to federal

question jurisdiction under 28 U.S.C. §1331 and 15 U.S.C. §2310(d). All claims set forth herein

arise from the same operative facts and should be disposed of in a single proceeding.

3.     This Court has supplemental jurisdiction to the extent required to adjudicate any state law claims necessary to address all issues and claims raised in the pleadings. The events, acts, and circumstances giving rise to this action occurred in Florida and venue is proper within this District.

4.     At all times material hereto, Plaintiff was a citizen of the State of Florida residing in Palm Beach County and the owner of a certain 2020 Rivamare yacht hull number 38-51 (hereinafter, "RIVA") which is the subject of this litigation.

**ALLIED MARINE, INC. a/k/a FERRETTI GROUP USA, INC. a/k/a FERRETTI GROUP USA**

5.     At all times material hereto, Defendant ALLIED MARINE, INC. is a Florida Corporation with its principal place of business and legal address at 1445 SE 16th Street, Fort Lauderdale, Florida and does business as FERRETTI GROUP USA.

6.     On August 24, 2010, FERRETTI GROUP USA, INC. merged corporately with ALLIED MARINE, INC. in which ALLIED MARINE, INC. was the surviving entity.

7.     FERRETTI GROUP USA is the fictitious name registered to ALLIED MARINE.

8.     ALLIED MARINE conducts business under the name of FERRETTI GROUP USA.

9.     ALLIED MARINE is owned 100% by FERRETTI S.p.A. as reflected on its Corporate Organization Chart, shown below:



10.     ALLIED MARINE is under the corporate control of FERRETTI S.p.A.

11.     The written Control Model adopted by FERRETTI S.p.A pursuant to Italian Legislative Decree 231/2001 expressly applies to all members of the FERRETTI GROUP including Defendants ALLIED MARINE, INC. d/b/a FERRETTI GROUP USA, INC. and FERRETTI GROUP OF AMERICA, LLC.

12.     At all times material hereto, Defendant ALLIED MARINE, INC. was part of the "Ferretti Group" (as identified in the FERRETTI S.p.A Control Model) and subject to the Code of Ethics promulgated by FERRETTI S.p.A.

13.     ALLIED MARINE's Director, Vice President, Controller and Secretary, Simone Meletti (hereinafter, "Meletti"), is employed by FERRETTI S.p.A. in Forli, Italy as its Group Sales and Marketing Controller.

14.     Previously, Meletti worked for FERRETTI S.p.A. as the Group Financial Controller.

15. Meletti is described internally as the Managing Director for the Americas or the Managing Director of Americas.

16. Meletti signs contracts as Vice President and authorized corporate officer.

17. At all times material hereto ALLIED MARINE INC. d/b/a FERRETTI GROUP USA, INC. was the apparent and actual agent of FERRETTI S.p.A.

18. ALLIED MARINE advertises to the public that it is the Exclusive Dealer for Riva in the United States East Coast.

19. ALLIED MARINE's website URL "alliedmarine.com" is registered to FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP which is the seller of the RIVA.

20. At all times material hereto, Privacy Statement on ALLIED MARINE's website discloses FERRETTI S.p.A. as the collector and recipient of users' private data.

21. At all times material, ALLIED MARINE was the Supplier of the RIVA.

22. At all times material, ALLIED MARINE d/b/a FERRETTI GROUP USA was the warrantor of the RIVA.

23. At all times material, ALLIED MARINE was the manufacturer of the RIVA.

24. The Manufacturer's Identification Code embedded in the Hull Identification Number of the RIVA (XFARRM51L920) sold to Plaintiff is registered to FERRETTI GROUP USA (ALLIED MARINE) in filings with the United States Coast Guard.

25. At all times material, ALLIED MARINE's registered trademarks were owned by Ferretti Group of America Holding Company, Inc., a Delaware company not registered to do business in Florida.

26. At all times material, Ferretti Group of America Holding Company, Inc. was a wholly owned subsidiary of FERRETTI S.p.A.

Case 0:21-cv-60358-RKA   Document 27   Entered on FLSD Docket 06/08/2021   Page 5 of 61

27. At all times material, Simone Meletti was an officer of Ferretti Group of America Holding Company, Inc.

**FERRETTI GROUP of AMERICA, LLC d/b/a FERRETTI GROUP**

28. At all times material hereto, Defendant FERRETTI GROUP OF AMERICA, LLC was a Florida Limited Liability Company with its principal place of business and legal address at 1445 SE 16th Street, Fort Lauderdale, Florida.

29. At all times material hereto, FERRETTI GROUP OF AMERICA, LLC was the owner of the fictitious name FERRETTI GROUP.

30. At all times material hereto, FERRETTI S.p.A was the parent company of the FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP.

31. At all times material hereto, FERRETTI GROUP OF AMERICA, LLC was wholly-owned by FERRETTI, S.p.A through Ferretti Group of America Holding Company, Inc. a Delaware company not registered to do business in Florida

32. At all times material hereto, FERRETTI GROUP OF AMERICA, LLC was controlled by FERRETTI S.p.A.

33. FERRETTI GROUP OF AMERICA, LLC is under the corporate control of FERRETTI S.p.A.

34. At all times material hereto, Defendant FERRETTI GROUP OF AMERICA, LLC was part of the "Ferretti Group" (as identified in the FERRETTI S.p.A Control Model) and subjectto the Code of Ethics promulgated by FERRETTI, S.p.A.

35. FERRETTI GROUP OF AMERICA, LLC's Managing Director, Vice president, Controller and Secretary is Simone Meletti who is employed by FERRETTI S.p.A. in Forli, Italy as its Group Sales and Marketing Controller. Meletti previously worked for FERRETTI

S.p.A. as the Group Financial Controller.

36.     At all times material hereto, FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP, was the apparent and actual agent of FERRETTI S.P.A.

37.     At all times material hereto, FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP was the registered owner of ALLIED MARINE d/b/a FERRETI GROUP USA's website (alliedmarine.com) and as such does business under the name of ALLIED MARINE.

38.     At all times material hereto, FERRETTI GROUP OF AMERICA, LLC's website URLs "Ferrettigroup.com" and "Ferrettigroupamerica.com" were owned by FERRETTI S.p.A.

39.     At all times material hereto, the Privacy Statements on both of FERRETTI GROUP OF AMERICA's websites list FERRETTI S.p.A. as the collector and recipient of users' private data.

40.     At all times material hereto, FERRETTI GROUP OF AMERICA, LLC was the Seller of the RIVA.

## FACTS COMMON TO ALL COUNTS

41.     At all times material hereto, ALLIED MARINE INC. d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP acted in concert to effectuate the sale and distribution of vessels in the United States, particularly in Florida, which were manufactured by FERRETTI S.p.A. in Italy including, but not limited to, the subject RIVA which identified the manufacturer as ALLIED MARINE d/b/a FERRETTI GROUP USA.

42.     Upon information and belief, FERRETTI S.p.A. controlled and oversaw the operations and conduct of business of ALLIED MARINE INC. d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP.

43.     FERRETTI S.p.A. is identified in the FERRETTI GROUP USA Limited Warranty as the manufacturer of the subject RIVA and delivered the vessel to the United States to be placed in the stream of commerce for sale to consumers.

44.     The FERRETTI GROUP USA Limited Warranty does not disclose ALLIED MARINE d/b/a FERRETTI GROUP USA as the manufacturer of the RIVA.

45.     ALLIED MARINE, LLC a/k/a FERRETTI GROUP USA, individually and as agent of FERRETTI S.p.A., marketed the RIVA for sale through its Sales Executive, Chris Coughlin.

46.     ALLIED MARINE d/b/a FERRETTI GROUP USA through its Sales Executive, Chris Coughlin, was the Selling Broker for the sale of the RIVA to Plaintiff.

47.     ALLIED MARINE d/b/a FERRETTI GROUP USA and its Sales Executive, Chris Coughlin, received a commission as the selling broker from the sale of the RIVA to Plaintiff.

48.     FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP entered into a contract for the sale of the subject RIVA to the Plaintiff, UNDERWATER EXPLORATION COMPANY, INC. The Purchase and Sale Agreement for the RIVA was assigned to KENNETH HOROWITZ with the approval and consent of FERRETTI GROUP OF AMERICA, LLC, individually and as agent of FERRETTI S.p.A. A copy of the Purchase and Sale Agreement is attached hereto as Exhibit "1."

49.     ALLIED MARINE d/b/a FERRETTI GROUP USA represented through its Sales Executive, Chris Coughlin, that a warranty on the yacht was to be given to the purchaser by the manufacturer, FERRETTI S.p.A.

**THE SHELL GAME**

50.     ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA LLC d/b/a FERRETTI GROUP are part of a corporate maze created in an attempt to deceive consumers and to shield themselves and related entities from federally created remedies under the Magnusson Moss Warranty Act and certain remedies under state law.

51.     The corporate structure was intended to insulate the companies from the rigors of complying with European and United States safety regulations.

52.     Under this corporate structure, the "exclusive dealer [ALLIED MARINE] on the eastern coast of the United States for the Group's new yachts" did not sell the yacht. Instead, its wholly owned subsidiary, FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, sold the yacht while the "exclusive dealer," ALLIED MARINE, became the warrantor under its fictitious name, FERRETTI GROUP USA, notwithstanding the manufacturer disclosed on the RIVA's Hull Identification Number under the fictitious name of FERRETTI GROUP USA.

53.     The RIVA was marketed to Plaintiff by ALLIED MARINE d/b/a FERRETTI GROUP USA's Sales Executive, Chris Coughlin.

54.     Throughout the transaction leading up to closing, the Plaintiff's contact with the Seller was through ALLIED MARINE's Sales Executive, Chris Coughlin.

55.     Neither Chris Coughlin nor ALLIED MARINE disclosed their relationship with FERRETTI GROUP AMERCIA d/b/a FERRETI GROUP or FERRETTI S.p.A to the Plaintiff.

56.     Despite the creation of a second entity [FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP] to sell the RIVA instead of the FERRETTI S.p.A. "exclusive dealer" [ALLIED MARINE d/b/a FERRETTI GROUP USA], ALLIED MARINE's Broker Chris Coughlin appears on FERRETTI GROUP of AMERICA's Purchase and Sale Agreementas as its "Sales Executive."

57. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share the same address of 1445 SE 16th Street, FortLauderdale, Florida.

58. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share the same address identified as the Ferretti Regional Office.

59. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP share the same corporate officers, Director, Vice President and Secretary.

60. FERRETTI GROUP OF AMERICA's Purchase and Sale Agreement deceptively recites that FERRETTI GROUP OF AMERICA is not a manufacturer of Yachts when in fact FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP is owned 100% by the manufacturer, as illustrated by it web addresses www.ferrettigroupamerica.com and www.Ferrettigroup.com which are registered to the manufacturer, FERRETTI S.p.A.

61. The copyrights on the FERRETTI GROUP AMERICA and FERRETTI GROUP websites are registered to FERRETTI S.p.A.

62. The privacy disclosures on the FERRETTI GROUP AMERICA and FERRETTI GROUP websites refer to FERRETTI S.p.A. as the collector and recipient of users' private data.

63. The FERRETTI GROUP AMERICA and FERRETTI GROUP websites contain FERRETTI S.p.A.'s VAT Number.

64. The FERRETTI GROUP of AMERICA website contains direct links to the builder FERRETTI S.p.A.'s corporate website.

65. Both ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP are subject to FERRETTI S.p.A.'s Control Model and Code of Ethics.

66. ALLIED MARINE, a supposedly separate legal entity, does not even own its own Trademarks. Instead, the ALLIED MARINE Trademarks are owned by Ferretti Group of America Holding Company, Inc. another wholly owned subsidiary of FERRETTI S.p.A. which is the owner of FERRETTI GROUP of AMERICA.

67. Financial results from the operations of ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP are included on FERRETTI S.p.A.'s Financial Reports and stock prospectus.

68. The corporate structure and practices described above creates a joint venture between FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP ofAMERICA d/b/a FERRETTI GROUP.

69. The companies are so intertwined and interlocked that they are essentially indistinguishable and are one company under a single dominant mind and control.

70. FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTIGROUP of AMERICA d/b/a FERRETTI GROUP share common interest, common control and shared financial interests.

71. FERRETTI S.p.A. permitted ALLIED MARINE to be registered as the manufacturer of the RIVA in an attempt to hide or shelter ALLIED MARINE from compliance with European safety standards.

72. FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share a common purpose in the

sale of vessels to consumers in the United States such as the Plaintiff.

73.     Upon information and belief, ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP have joint or shared control over aspects of the venture, including advertising, merchandizing, sales conditions and service of the vessel among others, through the dominant mind and control of Simone Meletti..

74.     Upon information and belief, FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP had a joint proprietary and/or ownership interest in the time and labor expended in selling, marketing and servicing vessels in the United States.

75.     Upon information and belief, FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP share in expenses, promotions, advertising and/or marketing of the vessels in the United States and Florida.

76.     Upon information and belief, FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP share in the profits of and/or mutually benefit financially from the sale and/or service of vessels in the United States and Florida.

77.     Upon information and belief, FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP share in the losses which may have been incurred from the sale and/or service of vessels in the United States and Florida.

78.     At all times material hereto there was a joint venture FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a

FERRETTI GROUP and each of the venturers acted in the course and scope of that venture with respect to the sale and marketing of the vessel to Plaintiff.

**THE PURCHASE**

79.     The RIVA vessel was purchased by KENNETH HOROWITZ for $1,254,000.00 for personal and family use.

80.     The Buyer's Closing packet was prepared and transmitted by Michelle Du Preez from ALLIED MARINE, not FERRETTI GROUP, on March 18, 2020.

81.     The ALLIED MARINE cover letter attaching Buyer's Closing packet also included a copy of ALLIED MARINE's Wire Instructions.

82.     The wire transfer instructions for FERRETTI GROUP (not ALLIED MARINE) listed Michelle Du Preez as the assistant tasked with managing the wire transfer on behalf of FERRETTI GROUP OF AMERICA further conflating ALLIED MARINE d/b/a FERRETTI GROUP USA with FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP.

83.     The FERRETTI GROUP's Privacy Policy, provided to Plaintiff at the time of closing, was issued by the manufacturer of the boat, FERRETTI S.p.A (not FERRETTI GROUP OF AMERICA).

84.     The Warranty Card presented to Plaintiff at time of closing was captioned RIVA WARRANTY CARD. The body of the warranty card refers to a **Ferretti Yachts** Warranty which was never produced to Plaintiff. The Warranty Card provides:

> "I understand that the **Ferretti Yachts Warranty** is effective only after I have completed, dated and signed this Warranty Card, and it has been received by Ferretti Group USA. I also understand that the **Ferretti Yachts Warranty** is the only warranty given by **Ferretti Yachts** and that it applies only to the boat I am purchasing identified on the Warranty Card."

See attached Exhibit "2." (emphasis added).

85.     Plaintiff did not receive a Ferretti Yacht Warranty.

86.     The Closing Packet also contained an Acknowledgment of Receipt of Riva Limited Hull Warranty Statement although no such Riva Limited Hull Warranty was ever produced.

87.     A Limited Warranty for the subject vessel was issued on behalf of FERRETTI S.p.A. by ALLIED MARINE, INC. d/b/a FERRETTI GROUP USA. A copy of the FERRETTI GROUP USA Limited Warranty (for Riva Yachts) is attached hereto as Exhibit "3."

88.     Plaintiff accepted the RIVA based upon the reasonable assumption that ALLIED MARINE would honor the written Warranty.

89.     Plaintiff accepted the RIVA based upon the reasonable assumption that the RIVA was safe and complied with all applicable safety regulations.

**CONDITIONAL ACCEPTANCE OF THE RIVA**

90.     On February 18, 2020, prior to closing, Plaintiff signed a Conditional Acceptance of the RIVA. The conditional acceptance is attached hereto as Exhibit "4."

91.     The Conditional Acceptance included the following handwritten conditions which have not been fulfilled:

a.  The kill switch magnet for the galley stovetop cover has not be installed. The killswitch is not functioning.

b.  Full Day of Riva 38 Instruction at Ferretti Dock in Ft. Lauderdale – includessystems, mechanical, electronics, etc.

c.  Full Day with Captain to transport Riva to dock in Palm Beach.  Will include use of boat and maneuvers plus docking tricks.

92.     Chris Coughlin, Yacht Sales Executive at ALLIED MARINE d/b/a FERRETTI GROUP USA, responded to the Conditional Acceptance stating:

"Your handwritten notes on the Conditional Acceptance show how important these items are for you, **now please trust us**. Ferretti Group needs theConditional Acceptance signed as initially written without anything else besides the typed survey deficiencies to move forward."

(emphasis added).

93.     The Plaintiff was lulled into acceptance by the representations of the Warrantor ALLIED MARINE d/b/a FERRETTI GROUP USA, by its Sales Executive, Coughlin, who represented to Plaintiff:

"This is also going to have to be a gentleman agreement and one of the many nice things the Ferretti Group will offer as our relationship grows."

94.     Plaintiff relied upon the above representations by writing Coughlin on March 6, 2020, stating: "Based on the email you sent (which is below) I have signed the Conditional Acceptance above."

95.     Plaintiff's trust was misplaced as ALLIED MARINE d/b/a FERRETTI GROUP USA violated the trust and did not keep its "gentleman['s] agreement."

96.     Prior to delivery of the RIVA, Plaintiff wrote to ALLIED MARINE d/b/a FERRETTI GROUP USA regarding signing of the Acceptance of New Vessel:

"As Chris [Coughlin] and I have discussed earlier today, I am signing for items and inspections (general due diligence) which I have not had the opportunity to personally conduct or review since the RIVA 38-51 will be delivered to me in Palm Beach sometime after you receive these documents. Chris has assured me that based upon Ferretti/Allied Marine Customer Care high quality standards that you will honor any deficiencies I may find once I have the opportunity to explore and use the RIVA. We will also conduct an in-person review of the RIVA in Palm Beach with a representative of Ferretti/Allied Marine at a future date. We are proceeding with this quick method of closing as we are all concerned about spreading the coronavirus to each other."

97.     The Plaintiff has revoked his conditional acceptance of the RIVA as the conditions have never been satisfied.

98.     FERRETTI/ALLIED have not honored, corrected or rectified deficiencies in the RIVA.

99.     The RIVA vessel was delivered to KENNETH HOROWITZ on or about March 20, 2020.

100.    After delivery of the vessel numerous defects were discovered which, unbeknownst to the purchaser, had existed at the time of manufacture and delivery of the vessel and which rendered the vessel unseaworthy, unreliable and unsafe to operate.

**THE DEFECTS**

101.    The RIVA yacht was delivered to Plaintiff late on March 18, 2020, because the captain was required to travel from Fort Lauderdale to Palm Beach slowly due to the Port engine overheating. Upon arrival an alarm was sounding, the engine hatch was raised to cool the engine, and the RIVA exhibited various electrical problems including the analog gauges were inoperative.

102.    A punch list of defects was prepared and sent to the Warrantor. The defects included:

a)  Propeller pods would trim up for no reason.
b)  Warning of loss of steering and joystick operation shown on Garmin glass after starting engines
c)  Both engine alternators would not output any current to batteries once engines werestarted.
d)  Table was stuck closed.
e)  Swim platform solenoid was stuck and pump kept running an alarm going afteropening.
f)  Aft bilge pump was running but not pumping water.
g)  Door to Sea Bob was crooked.
h)  Gaskets to engine room were not sealing properly.
i)  Swim platform chipped from hitting propeller pod.
j)  Sliding door to cabin scraping on trim inside helm area.
k)  Water leaking from Bimini top storage inside of cabinets.

l) Water damage to cabinet from leak

m) Toilet not flushing properly

n) Swim platform opening by itself.

o) Air conditioning would intermittently shut down and blow warm air.

p) Radio turning on by itself.

103. The following is a non-exhaustive list of operational issues and attempts to repair the defects were made by Warrantor. Missing from the list are call backs by Plaintiff to fix repairs that Warrantor failed to correct on the first attempt:

a. Late March Propeller pods raised by itself causing the swim platform to hit the pod.

b. March 31, 2020 High engine temperature alarm.

c. April 14, 2020 when attempting to use the RIVA the propeller pod hit the swim platform due to a design failure.

d. April 16, 2020 a technician arrived to address some of the defects. The technicianreviewed the schematics of the boat for sensors on the propeller pods and damagedthe stuck table (see 61 d. above) when opening.

e. May 11, 2020 when attempting to use the RIVA an alarm on the control display warned of low battery power and the Interceptor voltage was low preventing use ofthe RIVA,

f. May 21, 2020 Plaintiff expressed concern over the inability of the RIVA's alternators to keep batteries charged. Plaintiff wrote Warrantor's representative, "Its scary wondering whether I'm going to have an engine start problem after we anchor multiple times." The warranty representative texted, "I agree,"

g. May 21, 2020 The Warranty representative spoke with the Warranty manager and replied to Plaintiff stating, "He's actively engaged in a fact finding mission betweenthe electrician, Volvo and the shipyard." The Warranty representative also spoke with the "US Riva rep to communicate your message."

h. May 21, 2020 Plaintiff threatened litigation if situation was not corrected. The Warranty representative acknowledged the Plaintiff's position was communicated"to FG."

i. May 22, 2020 Warrantor's electrician found voltage was dropping and found neither alternator was charging the batteries.

j. May 29, 2020 Volvo Penta techs and Electrician on board to correct electric issues.

k.  May 30 a trip to watch the SpaceX launch offshore with friends was aborted due tothe pods trim system malfunctioning. The starboard pod stuck at +24° with the portpod stuck at -4° preventing use.

l.  May 30, 2020 Plaintiff writes the ALLIED MARINE's Warranty Manager, "We lost the ability to control the Starboard props and stuck in up position. Nicola [Warranty Representative], it seems almost every time I try to enjoy the boat something electrical happens."

m.  June 9, 2020 Warrantor sent carpenter to remove the damaged table for repair.

n.  June 12, 2020 Warrantor sent Volvo tech to investigate non-functioning trim tabs and motor pods who was not able to correct problem. In addition the Engine tech was waiting on wiring diagrams and schematics from manufacturer to fix the charging system. There were three unsuccessful attempts to repair which left the boat unable to operate. Warrantor modified the electrical system permitting the generator while operating the boat to keep the batteries charged as the alternators did not charge the batteries. Owner chose not to put his family at risk with the unsafe workaround.

o.  June 16, 2020 Engine repairer received wiring schematics but not able to correct problem for two weeks.

p.  June 18, 2020 Electricians arrive at boat with wiring schematics and found two wiring errors from when the boat was constructed in Italy. The electricians corrected the wiring errors but still no output from the alternators.

q.  June 22, 2020 Warrantor's manager and electricians still investigating electrical issues and found inoperative fuse caused by previous repairer prevented operation.

r.  July 6, 2020 Air conditioning blowing warm air.

s.  July 8, 2020 Air conditioning still not working.

t.  July 9, 2020 Warrantor is attempting to provide an Air conditioning technician.

u.  July 10, 2020 the Volvo Penta Glass Cockpit System displayed voltage fault and steering servo errors and joystick control errors causing Plaintiff to cancel trip to Florida to use boat with son.

v.  July 10, 2020 Plaintiff requests replacement boat from Warrantor due to majorelectrical issues.

w.  July 13, 2020 Volvo technicians diagnosed issues and corrected the error warning.

x.  July 13, 2020 Air conditioner technician unsuccessfully attempted repair. Techreturned and found mis-wired sensor.

y.  July 23, 2002 Sump for air conditioning drain was not working – owner remedied.

z.  July 27, 2020 Sump for air conditioning drain was not working – owner remedied.

aa.  Between July 30 and September 30, 2020, the boat was in dry storage for

the hurricane season.  Warrantor made no efforts to correct problems during this period.

ee. October 1, 2020 Swim platform alarm and pump would not shut off.

ff. Mid October Technician arrived to correct the problem by spraying silicon of the solenoids.

gg. October 29, 2020 technician installed check valve for the aft bilge pump. AdjustedSea Bob Garage. Installed additional gaskets for the engine hatches to make the hatches seal properly to prevent water ingestion into the machinery spaces and repaired the air-conditioning drain pump.

hh. December 1, 2020 Plaintiff speaks with Ferretti's Managing Director for the Americas to complain about the delay and inability to get the RIVA operational. Ferretti's Managing Director said the "wait is ridiculous."

ii. December 19, 2020 Attempted trip with guests aborted when swim platform startedopening by itself creating dangerous conditions to operate the RIVA. The air conditioning failed to start. The radio turned on and off by itself signifying electrical fault. Water was found accumulating in the starboard cabinet.

jj. December 21, 2020 Technician attempted repair of air conditioner. The technicianfound the port helm dashboard control switches were corroded due a design defect allowing water intrusion into switch housing. Discovered water channels into cabinets when Bimini top is used. Finish on interior cabinet damaged due to water instructions. Found sliding cabin door is scoring when opening as internal obstruction is scraping the surface of the door. Attempted repair of misfunctioningtoilet.

kk. December 22, 2020 Technician returned to repair the air conditioning.

ll. December 22, 2020 A second technician arrived to replace 5 of the 13 corroded switches. for control of swim platform and Bimini top. The technician could not replace remainder of control switches necessary for safe navigation of the vessel. To date neither the Warrantor nor the manufacturer has replaced the 8 remaining switches. Could not repair sliding door. Could not correct water intrusion problem caused by Bimini top. The technician advised builder intervention was required. Radio continued  to turn on without human intervention.

104.    Warrantor did not return to repair any of the unresolved issues after December 22,2020.

105.    On January 1, 2021, Plaintiff sent a written notification to the Warrantor and Seller of its Revocation of Acceptance and intent to rescind the contract for a number of reasons including the fact that the electrical issues required the vessel to be shut down while underway

creating a serious life and safety hazard; the swim platform spontaneously lowered while the vessel was in operation resulting in the boat limping home; and control switches failed and corroded due to a combination of water instruction and stray current.

106. The January 1, 2021, notice also informed the Warrantor and Seller the vessel was unreliable, unmerchantable, unseaworthy and non-conforming to industry standards and of Defendants' failure to repair or replace the defective vessel or provide a refund.

107. In response to the demand, Warrantor, Seller and manufacturer sent its warranty manager to inspect the boat. During the inspection the warranty manager did not energize the RIVA's electrical system and spent only 18 minutes to address the defects outlined in the January 1, 2021 demand letter.

108. On January 26, 2021, the Seller responded to the demand letter denying the vessel was unmerchantable, unseaworthy and non-conforming to industry standards. The Seller wrote "Ferretti Group believes the Yacht is fine and apart from the few open items that Ferretti Group commits to address, the Yacht does not present any serious issues."

109. During Plaintiff's eleven month period of ownership, the RIVA has been operated less than 22 hours with most of the hours attributed to sea trials and testing rather than personal use.

110. The RIVA continues to display error codes and messages when attempting to operate the vessel or other mechanical or electrical issues arise during attempted operation requiring that the boat either remains at dock or to returns to dock.

111. Prior to Plaintiff seeking legal relief, Defendants ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP were aware of the various issues plaguing the RIVA during the eleven month period Plaintiff

owned the vessel.

112.   During the eleven month period of ownership, prior to seeking legal relief, the RIVA has been serially under repair addressing various issues but without resolution of all of the issues preventing safe and reliable operation of the RIVA.

113.   Plaintiff has advised the Defendants of the defects and afforded them substantial opportunity to cure or repair the defects, but Defendants have been unable or unwilling to rectify and repair the problems.

114.   Plaintiff has not had reasonable use of the boat for normal cruising enjoyment during the eleven months period of ownership. The engines have logged only 22 hours of operation (not cruising) while owner was on board with serious operational problems occurring for a majority of the hours.

**CONSTRUCTION STANDARDS**

115.   The RIVA was constructed in Italy by Ferretti, S.p.A.

116.   The European Recreational Craft Directive 2013/53/EU as amended ("RCD2") governs the requirements and safety standards to which watercraft must be constructed within the European Union.   The Directive sets out minimum technical, safety and environmental standards for the trade of boats, personal watercraft, marine engines and components in Europe.

117.   The European directive is harmonized with ISO standards in the RCD2.

118.   All watercraft constructed in the European Union are required to be certified that such construction meets the RCD2 directives.

119.   RINA is one organization authorized by the European Union to certify builds.

120.   RINA, in addition to the RCD2, has its own safety rules which it implements.

121.   The RIVA has a Build Plate affixed to the boat as required by European law.

122.    The RIVA's Build Plate declares the builder as FERRETTI S.P.A.; the Design

Category B; and RINA Certification with the CE mark of Conformity, as shown below:



123.    Despite the presence of a CE mark on the Build Plate and an issued Certificate of

Conformity, the RIVA is not compliant with European Union minimum safety requirements.

124.    European Directives require that a written Declaration of Conformity must

always accompany the watercraft.

125.    Despite the requirement that a written Declaration of Conformity always

accompany the watercraft, the RIVA did not have one.

126.    The RINA website contains a list of vessels in which RINA has issued a

Certificate of Conformity.

127.    The RINA website lists sixteen (16) RIVA 38 RIVAMARE with Certificate of

Conformity.

128.    RIVA hull 51 manufactured in December 2019 – Model year 2020 (the subject

RIVA) does not appear on the RINA website.

129.    A Certificate of Conformity for the Plaintiff's boat is not reflected on the RINA website.

130.    The Owner's Manual issued with the RIVA provides the European Craft Identification Number [CIN] not the correct Hull Identification Number [HIN].

131.    The Owner's Manual represents that the boat was built to "EC" conformity according to the requirements of Directive 94/25/EC as amended by 2013/53/EU which is false. The RIVA was not constructed according to the cited Directives.

132.    The Owner's Manual represents that the boat was built according to RINA Classification which is also false.  The RIVA was not constructed according to RINA Class Rules.

133.    In addition to RCD2 and RINA standards, the United States has safety standards that apply to watercraft.

134.    The RIVA was originally manufactured with a European Craft Identification Number (CIN).

135.    When the RIVA was imported into the United States for sale, ALLIED MARINE affixed its own Hull Identification Number (HIN).

136.    Any vessel imported into the United States must conform with applicable safety regulations and standards of the Government before the vessel or equipment is operated on waters subject to the jurisdiction of the United States. 46 U.S.C. § 4304.

137.    The American Boat & Yacht Council ("ABYC") has promulgated Marine Safety Standards that provides the nationally accepted standards for the construction and repair of recreational vessels. *FSS, Inc, v. W-Class Yacht Co., LLC*, 2018 U.S. Dist. LEXIS 26489, *19,

2018 AMC 1107, 2018 WL 953337 (D. Me. Feb. 20, 2018); *Carib Resorts, Inc v. Watkins' Underwriters at Lloyds*, 2018 U.S. Dist. LEXIS 46456, 2018 WL 8048755 (S.D. Fla. Mar. 20, 2018); *Cowley v. Sunset Yacht Charters. Inc.,* 2011 U.S. Dist. LEXIS 78380, 2011 WL 2938431 (S.D. Fla. July 19, 2011).

138.    The RIVA is not compliant with ABYC guidelines and is otherwise unsafe.

**CURRENT UNCURED  DEFECTS**

139.    The RIVA's aft engine hatches do not seal in contravention of ABYC H-3; RCD2 Section 3.4 and RINA standards allowing rainwater ingress onto the engines. This has resulted in damage to both engines. Due to the critical nature of the engines, electrical panels, generator, etc. these aft engine room hatches should be watertight and to achieve this would require significant modifications that would change the function and the cosmetic appearance of these hatches. There have been failed attempts by Warrantor to repair this problem.

140.    The RIVA's forward machinery space hatch does not seal in compliance with ABYC H-3, RCD2 Section 3.4 and RINA standards. The failure to seal allows rain water ingress that falls directly onto the Sea Keeper causing water damage to this component. As a result, the Sea Keeper is now tripping the breaker and will not activate.

141.    The bulkheads separating the engine and electrical compartments are not sealed from the living quarters which permits free communication of air, gases and toxic gases from the byproducts of machinery, electric devices or fire.  This manufacturing or design defect constitutes a fatal flaw that is a deadly defect rendering the RIVA unsafe, dangerous and in violation of RCD2 5.1.1; RINA standard 5.10.1 and ABYC guidelines. Smoke or toxic gases travel unhindered from the engine and electrical compartment into the living quarters and the Defendants have not installed either a CO or $CO_2$ alarm aboard the vessel.

142.   Air conditioning was found installed in the forward machinery space. The evaporator is in the forward machinery space which is subject to carbon monoxide. Air from the V-berth cabin circulates through the forward machinery space and if there are any leaks in the ductwork that could potentially introduce dangerous carbon monoxide gases into the cabin. This should be considered a safety issue and the re-circulation of air in the V-berth Cabin should be contained within the V-berth cabin to prevent any potential safety problems. The AC system should not be inside the machinery space. To rely on the integrity of a flexible duct and exhaust systems presents a safety issue that can result in serious health problems and/or death.

143.   Bimini top storage compartment does not seal or properly drain allowing rain water ingress to fall directly adjacent to the generator in the aft machinery space. This cover is not a hatch and is exposed to the environment in violation of ABYC H-3, RCD2 Section 3.4 and RINA standards. The design actually funnels the accumulated rainwater toward the actuator for the compartment. A fixed piece that is also fitted with a Velcro canvas cover is supposed to prevent this accumulated rainwater from entering the aft machinery space but it does not. The poorly sized drains located on the port and starboard corners are about ¼" in opening and easily clog. The rainwater accumulates and seeps underneath and over this rain dam and into the aft machinery space presenting a safety hazard.

144.   In the same area referenced in the paragraph above and associated with the mechanical actuators for the Bimini top. The port and starboard hinges and actuators communicate with the storage compartments on the port and starboard sides of the cockpit area. The actuators are exposed to the environment and have allowed for rainwater to enter the storage compartments. This has caused water damage to the wood finish, cooler, hinges and runners. This is a poor design. The actuators need to be isolated from the storage compartments and this

will require significant modifications to correct.

145.    The cockpit has bench seating with storage compartments below. The bench seating is exposed to the environment and is subject to wind and rain. All are fitted with drains except for the compartment that is fitted with the emergency whale gusher pump and the valves to the bilge pumps. There are no drains in this compartment. The bilge pump valve manifold penetrates the compartment and communicates with the forward machinery space. The hatch cover for this compartment is not watertight. When water accumulated to a level of approximately 1 inch, water started to pour into the forward machinery space onto the freshwater pump and the Sea Keeper sea water cooling pump. This is a poor design presenting a safety hazard.

146.    The Volvo DUO prop outdrives when trimmed up will hit the bottom forward edge/ hinge of the swim platform. The cavitation plate of the outdrives & bottom edge of the swim platform have an interference with each other. To lower the aft swim platform, the outdrives must be trimmed down otherwise there will be physical contact and damage. This is a design defect. There are no alarms to warn of this problem. During a Joint inspection of the RIVA by all parties to this lawsuit, the Defendants' captain damaged the RIVA's transom area when testing this defect.

147.    The sliding hatch for the V Berth Cabin sits on tracks and slides into a pocket when open that is behind the main helm. The surface of the hatch is visibly scratched in several areas from contact. There are clear problems by the noise from the hatch when moved. The sliding hatch is flawed in function. There is no access panel behind the helm station. The electronics and wiring were exposed to the sliding surface of the hatch and made contact. The hatch is also exposed to wind and rain. The design of this hatch will expose the backside of the

electronics to rainwater. This arrangement is a design flaw that until corrected will continue to reoccur and continue to cause further damage to the hatch and the electronics.

148.    The RIVA is fitted with two (2) machinery spaces, forward and aft. Both spaces are fitted with fire suppression systems that appear to be sized for the compartment. The flaw is that both compartments communicate with each other, hatches do not seal, and no dampers on the air inlets to the machinery space were observed. It does not appear that the two fire suppression bottles, as rigged, would both simultaneously discharge as required by ABYC 4.8.10.5.

149.    The RIVA is not compliant with RCD2 3.8 which requires that every habitable recreational craft be provided with viable means of escape in the event of fire.

150.    The RIVA is not compliant with ISO 9094:2015 which is harmonized into Directive 2013/53/EU.

151.    The single burner electric stove in the galley does not meet ABYC A-3 Galley stove standards as there was insufficient clearance for the overhead cabinet which was constructed of wood.

152.    The head (toilet) 120 volt receptacle ground fault circuit interrupter is a tenmilliampere device and does not adequately protect personnel from shock and electrocution.

153.    The 120/240 volt AC generator is undersized for the vessel loads. The generator cannot power all of the RIVA's installed equipment. The owner's manual does not contain any information on load management and does not warn about electrical failure associated with normal operation of the RIVA equipment.

154.    The battery charger output rating does not appear to be adequate to keep up with the 12 volt loads when operating with a full complement of guests.

155.    A battery charger DC grounding conductor is not installed. Battery positive fault tothe charger chassis will result in an electrical fire.

156.    Accelerated corrosion damage to electrical switches in the control station port switch section is evident. This condition exhibits conclusive evidence of saltwater intrusionbehind this panel.

a.   Some of the switches appear to brand new (i.e., not exhibiting corrosion damage); Five of the switches have reportedly been replaced.

b.   The electrical terminals connected to some of the new switches still exhibit evidence of water intrusion and corrosion damage.

c.   This switch panel includes Seakeeper gyro stabilizer control panel, steering control harness connections, data network cable connection, an unidentified audiblealarm.

d.   Based on the condition of the switches that have not yet been replaced, the reliability of all other devices in this panel void cannot be assured.

157.    A control lever failure alarm sounds upon activation of the engine controls with a display message indicating that a Volvo Penta repair facility should be contacted as soon as possible. Volvo Penta has made service calls yet faults still exist. The engine control lever and the associated connections are in the areas of the previously mentioned water intrusion.

158.    There are numerous sporadic failures or malfunctions of various vessel control systems (outdrive hydraulics, swim platforms, stereo, engine alarms). The Bimini top obscures the navigational anchor light from the rear side of the vessel.

159.    The shore power inlet enclosure drain does not appear to be large enough to adequately drain water during heavy rain or water washing over the stern. Flooding and partial submersion of the shore power cord 240 volt connection are likely to occur.

160.     The shore power cord end cover sealing ring is not installed, which significantly degrades the watertight integrity of the shore power cord end to the shore power inlet connection.

161.    The engine room shore power inlet circuit breaker short circuit interrupting

capacity is inadequate.

162.    Shore power inlet ELCI (equipment leakage circuit interrupter) protection is not fitted. ELCI helps to prevent electrocution and electric shock drowning.

163.    The main cabin circuit breaker panel 120/240 volt main RCCB (residual current circuit breaker) is rated for 400 volts 50 hertz three phase operation and is not rated for the connection scheme (single phase 120/240 volt 60 hertz operation).

164.    The AC distribution neutral conductor from the engine room contactor enclosure to the circuit breaker panel located in the cabin is composed of undersized conductors connected in parallel rather than composed of a single adequately sized conductor.

165.    The main cabin circuit breaker panel 240 volt AC circuits are not segregated from the 12 VDC circuits.

166.    The air conditioning circuit breaker is a ten ampere device despite the equipment manufacturer specification that the minimum fuse size should be twelve amperes.

167.    The Alternating Current receptacles are on one leg connected to a single 13 ampere breaker which is insufficient to operate the RIVA under typical conditions.

168.    The electrical drawing of the AC receptacle circuit shows a two pole 16 ampere breaker.  The RIVA is not built according to the drawing. The actual breaker is 13 ampere with no overcurrent protection on the neutral.

169.    The Gyro stabilizer circuit breaker is a 20 ampere device despite the equipment manufacturer specification plate indicating a 25 ampere current draw.

170.    The main engine alternators show evidence of water intrusion and corrosion damage associated with water intrusion through the hatches.

171.    Engine room cathodic bonding conductor connections have been made below

thelevel of normal accumulated bilge water.

172.     The 12 volt lighting circuit breakers do not appear to be properly sized for thevarious applications.

173.     A bow thruster DC grounding conductor is not installed. A battery ground faultcould result in catastrophic electrolytic stray current.

174.     Battery bank ventilation is not installed. Any vented hydrogen gas will exhaust intothe engine room.

175.     The services battery wiring runs are composed of two undersized conductors ratherthan a single conductor rated for 400 ampere service.

176.     The swim platform control and outdrive lift functions are not interlocked. This is adesign defect.

177.     The forward engine space ventilation extractor does not appear functional.

178.     Forward of the chain locker a small oval drain. The purpose of the drain is to prevent water from flowing onto the foredeck. This drain is exposed and, like the other drains on the boat, is frequently plugged with debris which allows rainwater to accumulate and cause damage. In this area of the bow the deck slopes down. The rub rail is higher than the sloping deck and when the drain is plugged with debris the rainwater puddles allowing the Stainless Steel trim and wood decks to be soaked. This has started to discolor the materials and will quickly cause damage to the area. Like the other drains on this boat they are poorly designed, inadequate and do not meet their purpose.

179.     The Owner's Manual does not reflect the RIVA as built.

180.     The above identified defects are known at this time.  Plaintiff reserves the right to include other defects as determined through discovery.

181. The vessel was delivered to Plaintiff with deadly design and manufacturing defects which renders the boat unsafe to operate in the manner intended rendering it unmerchantable.

182. The vessel is not fit for the ordinary purposes for which it was intended to be used.

183. The RIVA continues to exhibit electrical faults and other error codes wheneverstarting the engines.

184. The Warrantor has not replaced eight of the corroded switches which control vitalfunctions of the RIVA.

185. The RIVA continues to be unreliable and unsafe despite the efforts of FERRETTI.

186. The RIVA is unfit and unsafe according to European Recreational Craft Directive 2013/53/EU; RINA Standards, ISO Standards and ABYC Guidelines.

187. The deficiencies with the RIVA are of such a nature as they cannot be cured and efforts to repair the defects and deficiencies have proven unsuccessful.

188. The RIVA is unsafe and unfit by any standard.

189. Plaintiff is a "consumer" as defined in 15 U.S.C. § 2301(3).

190. Defendant ALLIED MARINE INC. d/b/a FERRETTI GROUP USA, is a "supplier" and "warrantor" as defined in 15 U.S.C. § 2304(4) and (5).

191. Defendant FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP is a "supplier" as defined in 15 U.S.C. § 2304(4) and (5).

192. Defendant ALLIED MARINE INC. d/b/a FERRETTI GROUP USA is a merchant and seller of the vessel and goods of the kind of the vessel are within the contemplation

of Fla. Stat. § 672.314, *et seq*.

193.    Defendant FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP is a merchant and seller of the vessel and goods of the kind of the vessel are within the contemplation of Fla. Stat. § 672.314, *et seq*.

194.    Defendant ALLIED MARINE d/b/a FERRETTI GROUP USA is a manufacturer of the RIVA as stated by ALLIED MARINE on the MIC code displayed on the RIVA's Hull Identification Number.

195.    The 2020 RIVA 38-51 is a "consumer product" as defined in 15 U.S.C. § 2301.

**MARKETING OF THE RIVA**

196.    The RIVA was marketed as like living on your personal private island to enjoy moments with your loved ones in "total safety."  FERRETTI advertised:

**Your private island**

Owning a yacht is like living on your personal private island. A place with no limits, where you can enjoy unique moments with your loved ones in total safety and privacy. A yacht is like a private island that moves with you. Allowing you to explore new places every day in absolute freedom, whenever you want. And a yacht is a safer place to be than any 5-star hotel or luxury resort. Choosing to become a yacht owner means choosing to invest in your wellbeing and peace of mind. Your yacht as your own private island, where youare the ultimate VIP.

197.    The Plaintiff's expectation was that his RIVA would permit him to "explore new places every day in absolute freedom" and would be "a safer place" "than any 5-star hotel."  The yacht was marketed to invest in "wellbeing and peace of mind."

198.    The defects in the RIVA prevented the Plaintiff's level of enjoyment and expectation that comes with the ownership of a new luxury Italian yacht. The defects rendered the RIVA unsafe and incapable of being operated reliably to "explore new places."

199.    Plaintiff had less than 22 hours of use of the RIVA due to operational,

manufacturing and design defects.

200.    Plaintiff has not received the benefit of the bargain.

201.    The FERRETTI GROUP USA Warranty fails at its essential purpose as the safety defects are not repairable.

202.    The limitation of damages under the Warranty and Purchase and Sale Agreement are unconscionable and unenforceable as the limitations were designed to absolve the Defendants from life, health and safety violations and limitation of liability for same is violative of public policy and Florida law.

203.    ALLIED MARINE INC. d/b/a FERRETTI GROUP USA advertised and marketed its vessels, including the subject vessel, to consumers located in the United States and, specifically in Florida and in Broward County.

204.    Defendant FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP advertised and marketed its vessels, such as the subject vessel, to consumers located in the United States and, specifically in Florida and in Broward County.

205.    Plaintiff performed all conditions precedent to this action, or the conditions have occurred.

206.    Plaintiff must act at this time because the Warranty issued by ALLIED MARINE d/b/a FERRETTI GROUP USA requires legal remedies be sought within one (1) year. The Warranty provides:

> "legal claims relating to any alleged problem with this Yacht will be barred unless suit is commenced within one (1) year from the date the cause of action accrues, regardless of the time remaining in the applicable warranty period."

207.    The Warranty contains a good faith requirement upon the consumer which states:

> It is Owner's obligation to fully cooperate with FERRETTI to allow repair or replacement as provided above, and the failure to cooperate in good faith will

void this warranty.

208.    It is a tenant of Florida law that such obligations are reciprocal in nature. The Warrantor breached the Warranty due to its bad faith.

## COUNT I:
## BREACH OF WARRANTY AS TO ALLIED MARINE d/b/a FERRETTI GROUP USA - THE WARRANTY FAILS OF ITS ESSENTIAL PURPOSE

209.    The allegations contained in paragraphs 1 through 208 above are realleged and incorporated as if fully stated herein.

210.    Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA.

211.    ALLIED MARINE d/b/a FERRETTI GROUP USA was the Warrantor as it issued the written FERRETTI GROUP USA LIMITED WARRANTY (FOR RIVA YACHTS).

212.    The Warrantor, ALLIED MARINE d/b/a/ FERRETTI GROUP USA, had eleven months to repair or replace the defective components of the RIVA without success.

213.    Plaintiff has advised the Warrantor of the defects and afforded them an opportunity to cure or repair the defects, but Defendants have been unable or unwilling to rectify and repair the problems described in paragraphs 107 to 157 above.

214.    A reasonable or seasonable time period to rectify the defects has expired.

215.    The RIVA is unreliable and unsafe in its current condition.

216.    Plaintiff is unable to use the boat as advertised and intended as a place "where you can enjoy unique moments with your loved ones in total safety . . . allowing you to explore new places" bringing "wellbeing and peace of mind."

217.    Plaintiff has had less than 22 hours use of the RIVA with most of the enjoyment curtailed by operational defects and safety issues.

218.    The safety issue created by the free communication of gas, toxic fumes and smoke in the event of fire renders the RIVA unsafe.

219. The safety and other design and manufacturing defects cannot be reasonably repaired.

220. The warranty restrictions, disclaimers and/or limitations contained in the Warranty are unconscionable under Florida Statute § 627.302, *et seq.,* ineffective under the MMWA, 15 U.S.C. § 2301, *et seq.,* violate FTC rules interpreting the MMWA, and violate Defendants' duty of good faith imposed under the Uniform Commercial Code and as a matter of law.

221. Florida Statute § 672.719 (2) provides "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Code."

222. The Comment 1 to section 2-719 explains the policy behind this section:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus . . . where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

223. Failure of the Warranty to meet its essential purpose because of the Warrantor's failure or inability to repair the RIVA provides Plaintiff with the general remedy under the UCC which includes Refund or Revocation of Acceptance.

224. The exclusive remedy under the ALLIED MARINE d/b/a FERRETTI GROUP USA Warranty of repair or replace fails in its essential purpose because the repair or replacement of only certain items does not satisfy the purpose of rectifying defects of the subject vessel under the circumstances of this case where the entire vessel is effectively rendered defective, unreliable, unmerchantable, nonconforming, unfit, unseaworthy, dangerous and unrepairable.

225. In addition, the warranty provides that the determination of a defect and remedy

of the defect is at the sole discretion of the Warrantor in violation of the MMWA.

226. The limitation on remedies further render any warranty offered by ALLIED MARINE d/b/a FERRETTI GROUP USA as illusory, depriving Plaintiff of reasonable protections against breach and the fair quantum of remedies guaranteed by the Uniform Commercial Code.

227. As a result of the foregoing, Plaintiff has sustained damages and is entitled to relief under the Uniform Commercial Code including, but not limited to, actual damages as well as consequential and incidental damages.

228. The Warranty offered by Defendant ALLIED MARINE d/b/a FERRETTI GROUP USA violates the requirements of the MMWA, 15 U.S.C. § 2301, *et seq.*, entitling Plaintiff to remedies thereunder.

229. Accordingly, Plaintiff may resort to all remedies under the MMWA, the Uniform Commercial Code and common law including, but not limited to, a refund as well as direct, consequential and incidental damages.

**WHEREFORE**, Plaintiff demands judgment against ALLIED MARINE d/b/a FERRETTI GROUP USA for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees pursuant to the Florida Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such other and further relief that this Honorable Court deems just and proper.

<u>**COUNT II:**</u>
**BREACH OF WARRANTY AS TO ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP AS JOINT VENTURERS**

230. The allegations contained in paragraphs 1 through 208 above are realleged and incorporated as if fully stated herein.

231.     Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP.

232.     FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP are joint venturers with respect to the sale, distribution and service of the vessel and they were jointly obligated under the warranty issued to Plaintiff for the vessel.

233.     ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP had eleven months to repair or replace the defective components of the RIVA without success.

234.     Plaintiff has advised ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP of the defects and afforded them a reasonable and seasonable opportunity to cure or repair the defects but Defendants have been unable or unwilling to rectify and repair the problems described above.

235.     A reasonable or seasonable time period to rectify the defects has expired.

236.     The RIVA is unreliable and unsafe in its current condition.

237.     Plaintiff is unable to use the boat as advertised and intended as a place "where you can enjoy unique moments with your loved ones in total safety . . . allowing you to explore new places" bringing "wellbeing and peace of mind."

238.     Plaintiff has had less than 22 hours use of the RIVA with most of the enjoyment curtailed by operational defects and safety issues.

239.     The warranty restrictions, disclaimers and/or limitations contained in the Warranty are unconscionable under Florida Statute § 627.302, *et seq.,* ineffective under the MMWA, 15 U.S.C. § 2301, *et seq.,* violate FTC rules interpreting the MMWA, and violate Defendants' duty of good faith imposed under the Uniform Commercial Code and as a matter of law.

240. Florida Statute § 672.719 (2) provides "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Code."

241. The Comment 1 to section 2-719 explains the policy behind this section:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. Thus . . . where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

242. Failure of the warranty to meet its essential purpose because of the Defendants' failure or inability to repair the RIVA provides Plaintiff with the general remedy under the UCC which includes Refund or Revocation of Acceptance.

243. The exclusive remedy under the Warranty of repair or replace fails in its essential purpose because the repair or replacement of only certain items does not satisfy the purpose of rectifying defects of the subject vessel under the circumstances of this case where the entire vessel is effectively rendered defective, unreliable, unmerchantable, nonconforming, unfit, unseaworthy, dangerous and unrepairable.

244. In addition, the Warranty provides that the determination of a defect and remedy of the defect is at the sole discretion of the FERRETTI in violation of the MMWA.

245. The limitation on remedies further renders any warranty provided to Plaintiff as illusory, depriving Plaintiff of reasonable protections against breach and the fair quantum of remedies guaranteed by the Uniform Commercial Code

246. As a result of the foregoing, Plaintiff has sustained damages and is entitled to relief under the Uniform Commercial Code including, but not limited to, actual damages as well as consequential and incidental damages.

247. The warranty offered by Defendants, further violates the requirements of the MMWA, 15 U.S.C. § 2301, *et seq.*, entitling Plaintiff to remedies thereunder.

248. Accordingly, Plaintiff may resort to all remedies under the MMWA, the Uniform Commercial Code and common law including refund as well as direct, consequential and incidental damages.

**WHEREFORE**, Plaintiff demands judgment against ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP of AMERICA d/b/a FERRETTI GROUP as joint venturers for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees pursuant to the Florida Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such other and further relief that this Honorable Court deems just and proper.

## COUNT III:
### REVOCATION OF ACCEPTANCE
### FERRETTI GROUP OF AMERICA, LLC d/b/a FERRETTI GROUP

249. The allegations contained in paragraphs 1 through 208 above are realleged and incorporated as if fully stated herein.

250. The cause of action alleged in this Count is brought pursuant to the MMWA, 15 U.S.C. § 2301, *et seq.*

251. Prior to purchase, at delivery and after delivery, Defendants represented to Plaintiff that the subject vessel was capable, suitable, appropriate and free of defects for the use intended by Plaintiff as a recreational vessel.

252.     After acceptance of delivery of the vessel, Plaintiff learned that the vessel was notdesigned, constructed, fabricated, manufactured or assembled as warranted.

253.     The subject vessel fails to conform due to the existence of defects in material, design, construction, workmanship, fabrication, manufacturing and assembly as more particularly set forth above.

254.     The nonconformity and deficiencies in material, design, construction, workmanship, fabrication, manufacturing and assembly are significant and have directly and substantially impaired the value of the vessel.

255.     Plaintiff has been denied the benefit he bargained for when purchasing vessel. Plaintiff has not had the benefit of the use of the RIVA. Plaintiff was simply not sold  the goods bargained for and has, therefore, been damaged to the full extent of the purchase price, consequential and incidental costs, as well as attorney's fees pursuant to  statute.

256.     Plaintiff relied upon the representations made by Defendants that they would honor the warranty commitments and Conditional Acceptance items and repair or replace the vessel and any defects in materials or workmanship as identified herein, to permit the vessel to operate as a recreational vessel.

257.     The RIVA is not constructed in conformity with the CE mark as represented on the RIVA's Build Plate.

258.     FERRETTI GROUP OF AMERICA's attempt to exculpate itself from compliance with technical European Directives, RINA standards, ISO standards, and ABYC Guidelines for health life safety issues is unconscionable and unenforceable under public policy.

259.     The vessel was delivered to Plaintiff with deadly design and manufacturing defects which renders the boat unsafe to operate in the manner intended.

260.     The vessel is not fit for the ordinary purposes for which it was intended to be used.

261.     FERRETTI GROUP OF AMERICA's attempt to exculpate itself from compliance with technical European Directives, RINA standards, ISO standards and ABYC Guidelines for health life safety issues is unconscionable and unenforceable as the Build Plate contained the CE mark certifying the RIVA as compliant when it was dangerously defective and in violation of the RCD2.

262.     Defendants have not satisfied the conditions set forth on the Conditional Acceptance as described above.

263.     Plaintiff has rescinded acceptance of the RIVA for non-compliance with the Conditional Acceptance.

264.     Notice of the vessel's defects was provided to Defendants within a reasonable time after the discovery of the defects.

265.     Defendants have had a sufficient opportunity to cure but they have failed to cure the defects in the vessel.

266.     As a direct and proximate result of Defendant's failure to satisfy its contractual obligations together with the nonconformity and deficiencies in design, construction, fabrication, manufacturing and/or assembly of the vessel, Plaintiff has elected to revoke its acceptance of the non-conforming vessel and seeks return of its purchase price, as well as actual, direct, consequential, incidental, and reliance damages which include, but are not limited to, the purchase price of the subject vessel, together with prejudgment interest, costs, and attorneys' fees pursuant to the MMWA, 15 USC § 2310(d).

**WHEREFORE**, Plaintiff demands judgment against FERRETTI GROUP OF

AMERICA, LLC d/b/a FERRETTI GROUP for consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees pursuant to the Uniform Commercial Code and MMWA, 15 U.S.C. § 2310(d); and for such other and further relief that this Honorable Court deems just and proper.

### COUNT IV:
### BREACH OF EXPRESS WRITTEN WARRANTY against ALLIED MARINE d/b/a FERRETTI GROUP USA

267.    The allegations contained in paragraphs 1 through 208 above are realleged and incorporated as if fully stated herein.

268.    Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA.

269.    ALLIED MARINE d/b/a FERRETTI GROUP USA was the Warrantor as it issued the written FERRETTI GROUP USA LIMITED WARRANTY (FOR RIVA YACHTS).

270.    Defendant ALLIED MARINE INC. d/b/a FERRETTI GROUP USA individually and as agent of FERRETTI S.P.A. expressly warranted to repair or replace all defects in items manufactured by FERRETTI S.p.A and to repair or replace all defects in the Yacht's hull and fiberglass structural components in the boat purchased by Plaintiff.

271.    Plaintiff discovered numerous defects in the materials and workmanship of vessel, including, but not limited to, defects in the hull, engines, electrical system and fittings and other equipment on the vessel.

272.    All defects described above were covered items under the terms of the express written warranty.

273.    After discovering the defects, Plaintiff contacted Defendant on numerous occasions within the warranty period and requested that the defects be repaired or replaced.

274.    As required by Defendant's warranty procedures, Plaintiff cooperated fully with

FERRETTI  to allow repair or replacement of the defects.

275.    Defendant and/or the agents or representatives of Defendant inspected and attempted to perform repairs on the warranted defects, but were unable to correct the problems after numerous attempts.

276.    Defendant had reasonable opportunities to correct the defects in the materials and workmanship of the vessel but failed to do so.

277.    Alternatively, the Defendant refused to honor the Warranty and recognize warrantyclaims.

278.    The action of Defendant in refusing and continuing to refuse to correct the defectsin the materials and workmanship constitute a breach of the express warranty covering the vessel and is a violation of the Magnuson Moss Warranty Act.

279.    Defendant ALLIED MARINE INC. d/b/a FERRETTI GROUP USA refused or was unable to repair the warranted defects in a reasonable time, failed to repair warranted defects after a reasonable number of attempts, or failed to honor the express written warranty.

280.    As a result of Defendant's breach of the express warranty, it has become necessaryfor Plaintiff to retain the undersigned attorneys and Plaintiff has incurred and continues to incur legal fees, costs, and expenses in relation to this lawsuit.

281.    The defects in the RIVA are not capable of repair.

282.    The Warranty fails at its essential purpose.

283.    As a result of Defendant's failure or inability to honor the terms of the express written warranty, Plaintiff has sustained damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant ALLIED MARINE INC. d/b/a FERRETTI GROUP USA, for damages under the Uniform Commercial Code and

MMWA, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' and any other relief permitted by law.

**COUNT V:**
**BREACH OF EXPRESS WARRANTY AS TO ALLIED MARINED/B/A FERRETTI GROUP USA and FERRETTI GROUP of AMERICA D/B/A FERRETTI GROUP, AS JOINT VENTURERS**

284.    The allegations contained in paragraphs 1 through 208 above are realleged and incorporated as if fully stated herein.

285.    Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP.

286.    FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, with respect to the sale, distribution and service of the vessel were jointly obligated under the warranty issued to Plaintiff for the vessel.

287.    Defendants FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, expressly warranted to repair or replace all defects in items manufactured by FERRETTI S.p.A and to repair or replace all defects in the hull and fiberglass structural components in the boat purchased by Plaintiff.

288.    Plaintiff discovered numerous defects in the materials and workmanship of the vessel,including, but not limited to, defects in the hull, engines, electrical system and fittings and other equipment on the vessel.

289.    All defects described above were covered items under the terms of the express written warranty.

290.    After discovering the defects, Plaintiff contacted Defendant FERRETTI S.p.A.,

ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, on numerous occasions within the warranty period and requested that the defects be repaired or replaced.

291.    As required by Defendant's warranty procedures, Plaintiff cooperated fully with the Joint Venturers to allow them to repair or replace the defects

292.    Defendants ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, and/or the agents or representatives of Defendant inspected and attempted to perform repairs on the warranted defects, but were unable to correct the problems after numerous attempts.

293.    Defendants ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, have had a reasonable opportunity to correct the defects in the materials and workmanship of the vessel but have failed to do so.

294.    Alternatively, the Defendants refused to honor the warranty and recognize Plaintiff's warranty claims.

295.    The Defendants' refusal or inability to correct the defects in the materials and workmanship constitute a breach of the express warranty covering the vessel and violate the Magnuson Moss Warranty Act.

296.    FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, failed to repair the warranted defects in a reasonable time, failed to repair warranted defects after a reasonable number of attempts, or failed to honor the express written warranty.

297.    As a result of Defendants' breach of the express warranty, it has become

necessaryfor Plaintiff to retain the undersigned attorneys and Plaintiff has incurred and continues to incur legal fees, costs, and expenses in relation to this lawsuit.

298.    As a result of Defendants' failure to honor the terms of the express written warranty,Plaintiff has sustained damages.

**WHEREFORE,** Plaintiff demands judgment against Defendant FERRETTI S.p.A., ALLIED MARINE d/b/a FERRETTI GROUP USA and FERRETTI GROUP OF AMERICA d/b/a FERRETTI GROUP, as joint venturers, for damages the under Uniform Commercial Code and MMWA, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees and any other relief permitted by law.

## COUNT VI:
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY ALLIED MARINE INC. d/b/a FERRETTI GROUP USA

299.    The allegations contained in paragraphs 1 through 208 above are realleged andincorporated as if fully stated herein.

300.    Plaintiff has privity with ALLIED MARINE d/b/a FERRETTI GROUP USA.

301.    ALLIED MARINE INC. d/b/a FERRETTI GROUP USA is a supplier of the RIVA.

302.    At all times material hereto, ALLIED MARINE d/b/a FERRETTI GROUP USA effectuated the sale and distribution of vessels in the United States, particularly in Florida, which were manufactured by FERRETTI S.p.A.

303. At all times material hereto, ALLIED MARINE is a merchant with respect to the sale of "goods of that kind" (in this matter Riva boats) as contemplated by Florida Statute 672.314.

304. Defendant ALLIED MARINE d/b/a FERRETTI GROUP USA, individually and as agent of FERRETTI S.p.A., issued the manufacturer's written warranty required by the purchase and sale agreement.

305. Under Florida Law implied in every contract for the sale of goods is a warranty ofmerchantability.

306. ALLIED MARINE d/b/a FERRETTI GROUP USA is a supplier, manufacturer and warrantor as those terms are defined by 15 U.S.C. § 2301.

307. As a supplier of consumer goods, the Defendants are precluded by law from disclaiming the implied warranty of merchantability during the duration of a written warranty. Any disclaimer of the implied warranties is ineffective as a matter of law. 15 U.S.C. § 2308.

308. There exists as a matter of law an Implied Warranty of Merchantability on the RIVA running from ALLIED MARINE to Plaintiff.

309. The vessel was delivered to Plaintiff with defects including, but not limited to, defects in the engine, electrical system, hull and fittings and other equipment on the vessel rendering it unmerchantable.

310. The vessel was delivered to Plaintiff with deadly design and manufacturing defects which renders the boat unsafe to operate in the manner intended rendering it unmerchantable.

311. The vessel is not fit for the ordinary purposes for which it was intended to be used.

312.     The vessel was delivered to Plaintiff not in conformity with the promises and affirmations of fact made on the CE mark contained on its Build Plate rendering it unmerchantable.

313.     Plaintiff contacted Defendants through its representatives and advised Defendants of the defects in the vessel.

314.     Defendant ALLIED MARINE d/b/a FERRETTI GROUP USA breached the implied warranty of merchantability by manufacturing and supplying the yacht which was defective, not merchantable and not fit for the ordinary purposes for which it was to be used.

315.     Plaintiff has incurred damages as a result of ALLIED MARINE d/b/a FERRETTI GROUP USA's breach of the implied warranties of merchantability and fitness; has lost the use of the vessel.

**WHEREFORE,** Plaintiff demands judgment against ALLIED MARINE d/b/a FERRETTI GROUP USA for damages, including consequential, compensatory, expectancy, resulting, incidental and reliance damages, prejudgment interest, and for costs, and attorneys' fees and any other relief permitted by law.

*By:/s Christopher R. Fertig*
CHRISTOPHER R. FERTIG, ESQ.
Florida Bar No.: 218421
chris.fertig@fertig.com
DARLENE M. LIDONDICI, ESQ.
Florida Bar No.: 516521
dml@fertig.com
FERTIG & GRAMLING
200 S.E. 13th Street
Fort Lauderdale, FL 33316
Telephone: 954-763-5020
Facsimile: 954-763-5412
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was filed and served via the CM/ECF filing system on June 7th, 2021, on all counsel of record or pro se parties identified on the Service List below.

*By:/s Christopher R. Fertig*
CHRISTOPHER R. FERTIG, ESQ.
Florida Bar No.: 218421
chris.fertig@fertig.com

## <u>SERVICE LIST</u>

| | |
|---|---|
| Serena A. Witter (42516)<br>switter@robertallenlaw.com<br>Umberto Bonavita (632791)<br>ubonavita@robertallenlaw.com<br>ROBERT ALLEN LAW<br>The Four Season Office Tower<br>1441 Brickell Avenue, Suite 1400<br>Miami, Florida 33131<br>Tel:   (305) 372-3300<br>Fax:  305) 379-7018)<br>*Attorneys for Defendants* | |

# FERRETTI GROUP OF AMERICA, LLC

### PURCHASE AND SALE AGREEMENT FOR NEW YACHT

| | | | | |
|---|---|---|---|---|
| Buyer's Name: Underwater Exploration Company, Inc. and/or Assigns | | | Base Price: | $1,170,000.00 |
| Address: 496 North Lake Way | | | Factory Options: | $262,755.28 |
| City, State & Zip: Palm Beach, Florida 33480 | | | Subtotal: | $1,432,755.28 |
| Home Phone: | | Work Phone: | Other: | ($248,755.28) |
| Cell Phone: 561.371.0106 | | | Subtotal: | $1,184,000.00 |
| Email: ken@kennethhorowitz.com | | | Dealer Installed Options: | |
| Tracking Number: R38-51 | | | Dealer Installed Options: | |
| Date: February 14, 2020 | | | Freight/Make Ready/Launch: | $70,000.00 |
| Sales Location: Naples, Florida | | | Subtotal: | $1,254,000.00 |
| Sales Executive: Chris Coughlin | | | Trade Allowance (See Addendum): | |
| Yacht Make/Model: 2020 Riva 38-51 XFARRM51L920 | | | Net Cash Due: | $1,254,000.00 |
| Engines: 2 x Volvo Penta D6 400 HP | | | Florida Sales Tax: | TBD |
| Engine Hours: | Port: | Stbd: | County Surtax: | TBD |
| Place of Delivery: Ft. Lauderdale, Florida | | | Trade/Admin. Delivery Expenses: | |
| Closing Date: On or before March 21, 2020 | | | Total Amount Due: | $1,254,000.00 |
| Estimated Delivery Date: On or before March 21, 2020 | | | Less Initial Deposit: 20% | $251,000.00 |
| | | | **BALANCE DUE:** | $1,003,000.00 |

Ferretti Group of America, LLC ("FGA") agrees to sell to Buyer, and Buyer agrees to purchase, the Yacht described above on the terms and conditions set forth herein (the "Agreement") for the Purchase Price (the "Total Amount Due" above, less taxes). This Agreement is not-binding on FGA unless signed by a corporate officer of FGA, the full $251,000.00 Deposit is paid and the funds clear in FGA's bank account. No other person is authorized to sign this Agreement on FGA's behalf other than a corporate officer.

☒ **NEW YACHT IN INVENTORY:** A Deposit of $251,000.00 is due now. If Deposit received is less than $251,000.00, Buyer shall complete Deposit within five (5) business days from the date of this Agreement. The balance of the Purchase Price and taxes (the "Balance Due" above) are due and payable at Closing.

☐ **NEW YACHT ON ORDER:** A Deposit of 10% is due now. If Deposit received is less than 10%, Buyer shall complete Deposit within five (5) business days from the date of this Agreement. The balance of the Purchase Price and taxes (the "Balance Due" above) are due either five (5) days prior to U.S.-based manufacturer's shipment of Yacht or ten (10) days prior to foreign manufacturer's shipment. FGA will give Buyer two (2) weeks' prior written notice of balance due date. All monies received from the Buyer shall be wired to the respective shipyard in order to be applied to the construction of the vessel.

1. **Terms of Payment.** Buyer shall pay for the Yacht as provided in this Agreement. Prior to Closing, Buyer shall pay the Balance Due in full. Payment for additional items and services ordered by Buyer after execution of this Agreement will be subject to additional Orders, specifying payment terms. All payments will be in U.S Dollars and made by wire transfer and will not be credited to Buyer until deposited and cleared into FGA's account. If at Buyer's request, FGA agrees to extend the Closing date, the balance due will accrue interest at the rate of one-and one-half-percent (1 ½%) per month and will be payable together with accrued interest at Closing. An extension of the payment deadline will not be deemed a waiver by FGA of any of its rights.

2. **Delivery; Delivery Date; Conditions to Closing.** Delivery will be made at FGA's place of business, unless otherwise agreed by FGA in writing. The Estimated Delivery Date is subject to FGA's ability to obtain the Yacht from the manufacturer and the non-occurrence of force majeure events such as, for example and without limitation, war, terrorism acts, strikes, accidents, tropical storms, hurricanes, floods, natural disasters, or other causes beyond FGA's control ("Force Majeure"). Unless FGA receives Buyer's full payment, FGA may postpone inspection, delivery and Closing. Buyer shall not assert, and hereby waives, claims for damages resulting from FGA's inability to deliver the Yacht by the Estimated Delivery Date. If a Force Majeure event occurs, the delivery terms (and all time periods referred to in this Agreement) will be considered extended by as many work days as necessary, or if the Force Majeure causes a total or constructive loss of the Yacht, then this Agreement will be deemed terminated, the respective rights and obligations of each party will cease to exist and be of no further force and effect and neither party shall be entitled to, and hereby waives, any claim for specific performance, damages, compensation, interest, or any other claims whatsoever. FGA will deliver the Yacht and all documentation only after FGA receives full payment. If Buyer requests a closing off-shore of the United States, FGA may, at its sole discretion, agree to deliver the Yacht to Bimini, Bahamas, for closing provided Buyer pays FGA its current off-shore closing fee of $3,500.00, as of the date hereof, but which may vary from time-to-time which includes cruising permit, crew expenses, airfare for crew return, and administrative fees, plus expenses associated with making the Yacht available for the off-shore closing in Bimini, Bahamas (i.e., dockage, notary, etc.). If Buyer refuses delivery after FGA notifies Buyer that Yacht is ready for delivery, Buyer agrees to pay all charges for storage and proper maintenance of the Yacht, insurance and any other incidental costs that FGA

Page 1 of 4

Initials: Buyer

Ferretti Group of America, LLC Purchase and Sale Agreement for New Yacht

Rev. 2019

Ferretti:

believes, in its sole discretion, to be necessary, from the date FGA notifies Buyer, that the Yacht is ready for delivery until the date delivery occurs and Buyer removes the Yacht from FGA's premises or until the date FGA declares Buyer to have repudiated this Agreement, as a condition of such subsequent delivery.  Buyer shall also be responsible for interest at the rate of one-and one-half-percent (1 ½%) per month on the unpaid balance until the date delivery occurs, which interest shall be payable at the time of such subsequent delivery. In the event of an offshore sale FGA is solely entitled, and Buyer has no claim, to any applicable drawback of the U.S. Customs duties. If Buyer is a corporate entity, Buyer shall at least three (3) days prior to Closing provide, in a form satisfactory to FGA, (a) proof that Buyer is in good standing under the laws of the state or government under which Buyer has been formed; (b) a consent action or resolution authorizing, approving and/or ratifying Buyer's purchase of the Yacht and execution of the Agreement; and (c) a power of attorney demonstrating the authority of the individual taking delivery and accepting the Yacht on behalf of the corporate entity.

3. **Price**. The Purchase Price for the Yacht if not in inventory is based upon information provided FGA by the manufacturer of the Yacht.  FGA is not obligated to sell the Yacht at the Purchase Price if the manufacturer later increases its price to FGA.  FGA shall advise Buyer of any price change after the date of this Agreement.  Buyer shall have five (5) days from notification of price change to cancel the Agreement by giving written notice to FGA.  Buyer's failure to cancel the Agreement will operate as Buyer's acceptance of the price change and FGA will rely upon that acceptance to proceed with accepting delivery of the Yacht from the manufacturer.

4. **Trade-in Yacht**. If a Trade Allowance is written in the box above, the terms of such trade-in and the amount of such allowance shall be governed by FGA's standard Trade-In Vessel Addendum, as attached hereto and incorporated herein.

5. **Changes; Modifications to Yacht.**  Buyer's request for changes or modifications to this Agreement must be presented to FGA in writing and are subject to manufacturer's ability to incorporate said changes in production. No changes or modifications to this Agreement or requests for such as to the Yacht will be valid unless in writing and signed by both parties.  Buyer (a) understands that the manufacturer retains the right to make changes in the model or design of the Yacht, as well as its accessories, at any time; (b) agrees that any such changes will not obligate either FGA or the manufacturer to make corresponding changes in the particular Yacht, engine, or accessories covered by this Agreement either before or after delivery thereof to Buyer; and (c) acknowledges that neither FGA nor the manufacturer make any representations or warranties concerning the Yacht's specific model year.

6. **Financing.** The Agreement is not contingent upon Buyer obtaining financing to purchase the Yacht.  Buyer acknowledges that FGA has made no representations or warranties with respect to Buyer's ability to obtain financing.

7. **No Reliance on Other Statements**. Other than as expressly stated herein, all statements regarding performance, including, without limitation, speed, handling, or fuel consumption made by FGA, manufacturer, or any other person, or contained in advertisements, brochures, and other publications (the "Statements") are estimates and are not guaranteed as each vessel's overall performance will vary depending upon the operator of the vessel, added equipment, and other factors.  Buyer acknowledges that Buyer is not relying on any such Statements and has not been induced by such to enter into this Agreement.

8. **Acceptance of Technical Specifications**.  Buyer understands and acknowledges that the Yacht and its components are built to manufacturer's plans and specifications, in manufacturer's sole discretion with respect to construction methodology and practice as well as systems designs, including, without limitation, specifications for hull structure, mechanical systems, electrical systems and hull design ("Technical Specifications").  Buyer accepts the Technical Specifications in full.  The interpretation and implementation of the Technical Specifications shall be in accordance with manufacturer's standards, and not pursuant to any classification society or trade association's standards or similar codes except if, and as, specifically set forth in the Technical Specifications.

9. **THE WARRANTY ON THIS YACHT IS GIVEN SOLELY BY THE MANUFACTURER.**  BUYER UNDERSTANDS AND ACKNOWLEDGES THAT (a) FGA IS NOT A MANUFACTURER OF YACHTS; (b) THE YACHT IS BEING WARRANTED SOLELY BY FERRETTI GROUP USA, A SEPARATE LEGAL ENTITY, AND ITS COMPONENTS ARE WARRANTED SOLELY BY THE MANUFACTURER OF PARTS AND EQUIPMENT SUPPLIED TO THE YACHT MANUFACTURER BY OTHERS IN ACCORDANCE WITH PUBLISHED WARRANTIES BUYER SHALL RECEIVE AT TIME OF PURCHASE; (c) FGA DOES NOT PROVIDE ANY WARRANTIES AS THE WARRANTIES OF FERRETTI GROUP USA AND SUPPLIERS ARE THE SOLE AND EXCLUSIVE WARRANTIES, EITHER EXPRESS OR IMPLIED; (d) ANY AFFIRMATION OF FACT OR PROMISE WRITTEN OR VERBAL MADE BY FGA, FERRETTI GROUP USA, OR MANUFACTURER WILL NOT BE DEEMED TO CREATE AN EXPRESS WARRANTY THAT THE YACHT WILL CONFORM TO THE AFFIRMATION OR PROMISE; (e) ANY DESCRIPTION OF YACHT IS FOR THE SOLE PURPOSE OF IDENTIFYING IT AND WILL NOT BE DEEMED TO CREATE AN EXPRESS WARRANTY THAT THE YACHT WILL CONFORM TO THE SAMPLE OR MODEL; (f) NO AFFIRMATION, PROMISE, DESCRIPTION, OR BROCHURE, OR MODEL WILL BE DEEMED PART OF THE BASIS OF THE BARGAIN; (g) THE SALE IS MADE ON THE EXPRESS UNDERSTANDING THAT THERE IS NO EXPRESS OR IMPLIED WARRANTY THAT THE YACHT WILL BE MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE; (h) FGA HEREBY DISCLAIMS ALL IMPLIED WARRANTIES INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE AND MERCHANTABILITY; (i) IN NO EVENT WILL FGA BE LIABLE TO BUYER FOR ANY DAMAGE ARISING FROM BUYER'S PURCHASE AND USE OF SAID YACHT, INCLUDING, WITHOUT LIMITATION, INCIDENTAL AND CONSEQUENTIAL DAMAGES; (j) BUYER'S SOLE AND EXCLUSIVE REMEDY FOR ANY CLAIM ARISING FROM A DEFECT IN THE YACHT OR ITS COMPONENTS SHALL BE PURSUANT TO THE TERMS AND CONDITIONS OF THE APPLICABLE PUBLISHED WARRANTIES; (k) A COPY OF FERRETTI GROUP USA'S LIMITED WARRANTY IS ATTACHED HERETO AND THAT COPIES OF THE ENGINE, TRANSMISSION AND COMPONENT WARRANTIES HAVE BEEN MADE AVAILABLE TO BUYER FOR REVIEW AND (l) IN THE EVENT YACHT IS A DEMONSTRATOR, BUYER ACKNOWLEDGES THAT IT HAS BEEN PURCHASED "AS IS" AND "WITH ALL FAULTS" AND THAT NO WARRANTIES FOR MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSED OR IMPLIED.

10. **Sales and Use Tax.** If FGA collects no sales tax, Buyer agrees (a) to read and become familiar with and comply with all Florida law and regulations concerning sales and use tax exemptions, including, without limitation, the *Florida Department of Revenue Rule 12A-1.007(9), Florida Administrative Code, and §212.05, Florida Statutes*; (b) to remove the Yacht from the State of Florida; (c) to meet applicable non-residency requirements; (d) to execute an exemption affidavit in a form satisfactory to FGA; and (e) to furnish FGA and/or the Department of Revenue with required proof that the Yacht has been removed from the state and is titled, documented, or registered outside Florida.

11. **Assignment.** Buyer may not assign this Agreement without FGA's consent, which, if given, shall require Buyer and Buyer's assignee to represent and warrant (a) that assignee, if an entity, is in good standing under the laws of the state or government under which assignee has been formed, and (b) that until after Closing, Buyer shall remain bound by this Agreement.

12. **Indemnification.**  Buyer hereby releases, indemnifies, and holds harmless FGA, its officers, directors, shareholders, salespersons, employees and agents from and against (a) any loss, damage, liability, legal action or claim of whatever nature arising out of this Agreement and other relationships provided for in this Agreement, including, without limitation, any such loss, damage, liability, legal action or claim arising out of any misrepresentation or breach of any representation, warranty or covenant by Buyer of any representation, warranty, or covenant set forth in this Agreement and (b) any Taxes that may become due as a result of the sale of the Yacht or incurred under, or imposed by any provision of federal, state, or local law or regulation, or common law.  This section survives beyond the Closing and delivery of the Yacht.

13. **Limitations; Liquidated Damages.** *Neither party shall be liable to the other for special, exemplary, consequential, or incidental damages under any circumstances or for any reason related to this Agreement. If FGA is unable to deliver the Yacht as set forth herein, FGA shall refund all deposit monies paid by Buyer, which will be Buyer's sole and exclusive remedy.* If Buyer (i) refuses to take delivery, (ii) pay any balance when due under the terms of this Agreement, or (iii) fails to perform any of the terms set forth herein, such shall be deemed a repudiation and cancellation of this Agreement.  FGA shall in any such event have the right to cancel this Agreement without further notice and retain the Deposit as liquidated and agreed damages. If the Deposit or part of the Deposit is a Trade Vessel rather than, or in addition to actual cash, then the Buyer acknowledges and agrees that FGA shall retain ownership of the Trade Vessel and Buyer shall surrender all ownership rights to same also as liquidated damages in the same manner as if the Trade Vessel were a cash deposit up to the value of what would otherwise be a customary and commercially reasonable liquidated damages amount when considering what an industry standard cash deposit would be for a transaction of this size and type, but in no event in excess of 30% of the Total Purchase Price referenced on page 1 of this Agreement. In the case of a Trade Vessel being used as a Deposit, Buyer further acknowledges and understands that the market value of the Trade Vessel for purposes of FGA exercising this right to liquidated damages will be based upon the actual resale value and not upon the published Trade-In Value published in this Agreement for purposes of the transaction. Thereupon, the parties shall be relieved of all other obligations to each other under this Agreement.  Buyer agrees that the amount of such liquidated damages – be it the cash on deposit or a Trade Vessel -- is reasonable in light of the anticipated or actual harm caused by the failure, difficulty of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy.

14. **Confidentiality.** Buyer agrees not to disclose the purchase price, except to the extent required by law.  This clause survives Closing.

15. **Miscellaneous.** (a) **Waiver**.  No claim or right arising out of this Agreement can be waived or discharged by one party, in whole or in part, unless in writing nor shall any waiver will be applicable except in the specific instance for which it is given. (b) **Entire Agreement**. This Agreement sets forth the entire agreement between the parties and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter; supersedes all prior and contemporaneous discussions, understandings, or agreements, whether written or oral, between the parties with respect to its subject matter; and may not be amended, supplemented, or otherwise modified, unless duly executed by or on behalf of each party (in the case of FGA, by an officer of FGA). (c) **Binding Effect**. This Agreement is binding upon, inures to the benefit of, and is enforceable by the parties to this Agreement and their respective successors and authorized assigns. (d) **No Third Party Beneficiary**. It is not the intention of the parties to confer third-party beneficiary rights upon any other person. (e) **Disputes.** Any proceeding arising out of or relating to this Agreement will be brought in the courts of the State of Florida, Miami-Dade County, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of Florida, and each of the parties irrevocably submits to the exclusive jurisdiction of each such court in any such proceeding, waives any objection it may now or hereafter have to venue or to convenience of forum, agrees that all claims in respect of the proceeding shall be heard and determined only in any such court and agrees not to bring any proceeding arising out of or relating to this Agreement in any other court.  Any and all process may be served upon Buyer in any action, suit or proceeding arising in connection with this Agreement by mailing the complaint and summons to the Florida Secretary of State and to party's address on file via certified mail, return receipt requested.  Such service of process will have the same effect as if the party being served were a resident in the State of Florida and had been lawfully served with such process in such jurisdiction.  The parties hereby waive all claims of error by reason of such service.  Nothing herein affects the right of any party to service process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the other in any other jurisdiction to enforce judgments or rulings of the aforementioned courts. (f) **Governing Law**. This Agreement will be governed by and construed exclusively under the laws of the State of Florida, without regard to conflicts-of-laws principles that would require the application of any other law. (g) **Invalid Provisions**. If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (i) such provision will be fully severable; (ii) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (iii) the remaining provisions of this Agreement will remain in full force and effect and will not be affected

by the illegal, invalid, or unenforceable provision, or by its severance herefrom; and (iv) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible. (h) **Counterparts; Effectiveness**. This Agreement may be signed in any number of identical counterparts, each of which will be an original (including signatures delivered via facsimile or electronic mail) with the same effect as if the signatures were upon the same instrument.  The parties may deliver this Agreement and the other documents required to consummate the transaction contemplated herein by facsimile or electronic mail and each party shall be permitted to rely upon the signatures so transmitted to the same extent and effect as if they were original signatures.  This Agreement will become effective when each party receives a counterpart signed by each other party. (i) **Notices**.  All notices to FGA will be sent to the location above and FGA's headquarters below.  All notices to Buyer will go to Buyer's address above, except that service of process may also be affected upon Buyer as provided in this section.  Notices must be in writing and delivered by Certified Mail, Return Receipt Requested, or by nationally recognized overnight courier service, or by hand, in each case with proof of delivery retained. Notices shall be effective upon delivery. (j) **Headings**. The headings herein are for convenience of reference only and will not be deemed to be part of the substance of this Agreement. (k) **Interpretation**. The Buyer has had an opportunity to consult with counsel of his choice prior to signing this Agreement.  If an ambiguity or a question of intent or interpretation arises, no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement. (l) **Waiver of Right to Trial by Jury**.  HAVING HAD AN OPPORTUNITY TO CONSULT WITH COUNSEL OF THEIR CHOICE, THE PARTIES IRREVOCABLY WAIVE THE RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM EITHER MAY HAVE ARISING UNDER OR IN ANY WAY CONNECTED TO THIS AGREEMENT OR THE YACHT.  This section survives Closing and termination of this Agreement.

16. **Broker**. Buyer warrants to FGA that it has not worked with any broker (other than an FGA broker) who might claim a commission in connection with this transaction other than Chris Coughlin (Name of Cooperating Broker, if any).

17. **EXECUTION BY FACSIMILE OR E-MAIL.**  Seller and Buyer hereby agree that this document may be transmitted between them by facsimile machine or e-mail and in counterparts.  The parties intend that faxed or e-mailed signatures constitute original signatures and that a faxed or e-mailed document containing the signatures (original, faxed or e-mailed) of all parties is binding on the parties.

18. **Other Provisions**.

1. Exhibits A, B and C are part of this Agreement.

2. Buyer agrees to pay as follows:
   - $251,000.00 as a Refundable Deposit due immediately upon dual execution of this Purchase and Sale Agreement
   - The balance of $1,003,000.00 is due at closing.

3. The sale of the Yacht is subject to a trial run and survey, which will be completed by Buyer on or before March 3, 2020. FGA will provide a captain for, and pay all running costs associated with, the trial run.  Buyer will pay all survey expenses.  Upon completion of its inspections, Buyer will have the option, exercisable in its sole discretion, to accept or reject the Yacht by giving written notice to FGA on or before March 3, 2020. If Buyer fails to give timely notice, Buyer will be deemed to have reject the Yacht. If Buyer accepts the Yacht, the Deposit becomes non-refundable, unless this Agreement is terminated other than by reason of the Buyer's default.  If Buyer rejects or is deemed to reject the Yacht, FGA will immediately return the Deposit to Buyer in accordance with such instructions as Buyer may provide.

4. Seller agrees to include the following items at no cost to Buyer:
   - Full cover that covers the entire Yacht to the waterline made with weather-proof material and without snaps.
   - Fresh Bottom Paint

5. In addition to the other documents already required, FGA will provide to Buyer at Closing an EIAPP certificate and technical file for each of the Yacht's main engines and CBP entry forms evidencing payment of duty on the Yacht.

BUYER: _____  Date: 2/18/2020

Print: Kenneth Horowitz, President    Date:

FERRETTI GROUP OF AMERICA, LLC
By: _____  02/19/2020
Print: Simone Meletti
Title: Vice President

BUYER: _____

Print: _____  Date: _____

Receipt of Deposit Acknowledged:
Amount: $251,000.00    Date: _____
Signature: _____

THIS AGREEMENT IS NOT BINDING UNTIL SIGNED BY BOTH PARTIES & DEPOSIT FUNDS HAVE BEEN RECEIVED & CLEARED INTO FGA'S ACCOUNT
Ferretti Group of America, LLC, 1445 SE 16th Street, Ft. Lauderdale, FL 33316



# WARRANTY CARD

NAME:                        Kenneth Horowitz

STREET:                      496 North Lake Way

CITY & STATE:        Palm Beach, Florida        ZIP:        33480

TELEPHONE:                                              HULL NO.: XFARRM51L920

DATE OF PURCHASE:                                  DEALER: FGA

BOAT NAME:        LA MELA

PURCHASER'S SIGNATURE & DATE:        _____ March 18, 2020 _____

I understand that the Ferretti Yachts Warranty is effective only after I have completed, dated and signed this Warranty Card, and it has been received by Ferretti Group USA. I also understand that the Ferretti Yachts Warranty is the only warranty given by Ferretti Yachts and that it applies only to the boat I am purchasing identified on this Warranty Card.

**X I have received my Owner's Manual**
☐ **I have not received my Owner's Manual**
THIS WARRANTY DOES NOT APPLY TO COMMERCIAL CHARTER BOATS

  PERSHING itama Riva  CRN CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16th Street · Ft. Lauderdale, Fl 33316 · T. 954.462.5557 · F. 954.766.4900
ferrettigroupamerica.com



## ACKNOWLEDGEMENT OF RECEIPT OF THE OWNER'S MANUAL

The undersigned, Kenneth Horowitz as the Owner/Agent at the address:

**Kenneth Horowitz**
**496 North Lake Way**
**Palm Beach, Florida 33480**

declares to have received a copy of the **Owner's Manual** concerning the **2020** Riva

**R38-51**, Hull #**XFARRM51L920**, in English language.

Signature                                         Kenneth Horowitz

_March 18, 2020_
Date

WALLY   FERRETTIYACHTS   PERSHING   ITAMA   Riva   MOCHI CRAFT   CRN   CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16ᵗʰ Street · Ft. Lauderdale, Fl 33316 · T. 954.462.5557 · F. 954.766.4900
ferrettigroupamerica.com



# ACKNOWLEDGEMENT OF RECEIPT OF

# RIVA LIMITED HULL WARRANTY STATEMENT

The undersigned, Kenneth Horowitz as the Owner/Agent at the address:

**Kenneth Horowitz**
**496 North Lake Way**
**Palm Beach, Florida 33480**

declares to have received a copy of the **RIVA Limited Hull Warranty Statement** concerning the **2020** Riva **R38-51**, Hull #**XFARRM51L920**, in English language.

_____
**Signature**

_____
**Kenneth Horowitz**

_____
**Date**

WALLY 3   FERRETTIYACHTS   PERSHING   itama   Riva   MOCHI CRAFT   CRN   CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16ᵗʰ Street - Ft. Lauderdale, Fl 33316 - T. 954.462.5557 - F. 954.766.4900
ferrettigroupamerica.com



## ACKNOWLEDGEMENT OF RECEIPT OF

## VOLVO ENGINE DOCUMENTATION

The undersigned, Kenneth Horowitz as the Owner/Agent at the address:

**Kenneth Horowitz**
**496 North Lake Way**
**Palm Beach, Florida 33480**

declares to have received a copy of the **VOLVO Engine Documentation** concerning the **2020** Riva **R38-51**, Hull # **XFARRM51L920**, Model **D6-400 DP**, engine serial numbers: Port # **A1086336** and Starboard # **A1087390.**

| | |
|---|---|
| _(signature)_ | |
| Signature | Kenneth Horowitz |

_March 18, 2020_
Date

WALLY   FERRETTIYACHTS   PERSHING   itama   Riva   MOCHI CRAFT   CRN   CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16ᵗʰ Street · Ft. Lauderdale, Fl 33316 · T. 954.462.5557 · F. 954.766.4900
ferrettigroupamerica.com



## ACKNOWLEDGEMENT OF RECEIPT OF ELECTRICAL SYSTEM DIAGRAM AND MAINTENANCE MANUAL

The undersigned, Kenneth Horowitz as the Owner/Agent at the address:

**Kenneth Horowitz**
**496 North Lake Way**
**Palm Beach, Florida 33480**

declares to have received a copy of the **Electrical System Diagram and Maintenance Manual** concerning the **2020** Riva **R38-51**, Hull # **XFARRM51L920**, in English Language.

_____
**Signature**

_____
**Kenneth Horowitz**

_March 18, 2020_
_____
**Date**

WALLY   FERRETTIYACHTS   PERSHING   itama   Riva   MOCHI CRAFT   CRN   CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16th Street - Ft. Lauderdale, Fl 33316 - T. 954.462.5557  F. 954.766.4900
**ferrettigroupamerica.com**



# ACKNOWLEDGEMENT OF RECEIPT OF ORIGINAL

# EIAPP CERTIFICATES

The undersigned, Kenneth Horowitz as the Owner/Agent at the address:

**Kenneth Horowitz**
**496 North Lake Way**
**Palm Beach, Florida 33480**

declares to have received the Original of the **Engine International Air Pollution Prevention (EIAPP) Certificates** concerning the **2020** Riva **R38-51**, Hull # **XFARRM51L920**, in English Language.

Signature                                                     Kenneth Horowitz

March 18, 2020

Date

WALLY   FERRETTIYACHTS   PERSHING   itama   Riva   MOCHI CRAFT   CRN   CUSTOM LINE

FERRETTI GROUP OF AMERICA LLC
1445 SE 16th Street - Ft. Lauderdale, Fl 33316   T. 954.462.5557   F. 954.766.4900
ferrettigroupamerica.com

EXHIBIT B

## FERRETTI GROUP USA LIMITED WARRANTY (FOR RIVA YACHTS)

*The Limited Warranty*. Ferretti Group USA ("FERRETTI") warrants, subject to the limitations and exclusions below, to the first retail purchaser ("First Owner") of this yacht ("Yacht") (provided the First Owner completes, signs and returns the FERRETTI Warranty Registration Card to FERRETTI at the address below by certified mail, return receipt requested, within ten (10) days of the First Owner's purchase of the Yacht) and to properly registered subsequent owners (the First Owner and any properly registered subsequent owner are hereafter the "Owner"), that it will repair or replace defects in (a) items manufactured by Ferretti SpA (the "Manufacturer") for one (1) year and (b) the Yacht's hull and fiberglass structural components for five (5) years. These warranties run from the earlier of the date title is transferred or the Yacht is delivered to the First Owner. Unless prohibited by applicable state law, legal claims relating to any alleged problem with this Yacht will be barred unless suit is commenced within one (1) year from the date the cause of action accrues, regardless of the time remaining in the applicable warranty period. It is Owner's obligation to fully cooperate with FERRETTI to allow repair or replacement as provided above, and the failure to cooperate in good faith will void this warranty.

*FERRETTI's Obligation*. FERRETTI's obligation is exclusively limited to repairing or replacing (at its sole discretion), at a facility it designates, any covered items it finds to be defective. Such shall be Owner's SOLE and EXCLUSIVE REMEDY against FERRETTI or the Manufacturer for any claims of economic loss resulting from product defects or failure. Repaired or replaced items shall be warranted as provided herein for the remainder of the applicable warranty period. Parts or components that are replaced shall thereupon become FERRETTI's property.

*Procedures*. Notice of defects occurring under this Limited Warranty *must* be given to FERRETTI (and to the dealer from whom the Yacht was purchased, if applicable) in writing within thirty (30) days after the date (a) of discovery of the defect or (b) it should reasonably have been discovered, at the address below, by certified mail, return receipt requested. *Notices must include the owner's name, address, phone number, the hull number, a description of the defect, the date it was discovered, the date of purchase, and the name and address of the party from whom the Yacht was purchased*. A copy must also be sent to the dealer from whom the Yacht was purchased. The Owner must thereafter provide all information requested by FERRETTI regarding the alleged defect. The Owner must obtain FERRETTI's written approval before repairing the yacht and must follow all applicable Manufacturer procedures. For items not covered by this Limited Warranty, the Owner must contact the component manufacturer. The provision of a survey to FERRETTI shall not constitute notice of defects or warranty claims hereunder unless the surveyor in such survey specifically indicates that a listed item constitutes in such surveyor's opinion a defect covered by this Limited Warranty.

*Future Improvements*. FERRETTI or the Manufacturer reserve the right to improve products in design or materials without any obligation to incorporate improvements into previously manufactured yachts. Ferretti yachts do not have a model year. Changes are incorporated in yachts by the Manufacturer as such are constructed from time to time. FERRETTI and Manufacturer do not warrant or represent that a particular yacht is of a particular model year.

*Entire Warranty; Modifications: Severability; Subsequent Owners*. This Limited Warranty is the complete and exclusive agreement between the parties concerning FERRETTI's warranty obligations and the Owner's warranty rights, superseding all prior or contemporaneous agreements, representations or warranties, oral or written, and all other communications between the parties relating to the subject matter hereof including, without limitation, FERRETTI's or the Manufacturer's marketing materials. No modification to or waiver under this Limited Warranty will be valid unless in writing and signed by an authorized FERRETTI officer. The invalidity or unenforceability of any one or more of the provisions herein shall not affect the validity and enforceability of the other provisions. Subsequent Owners to the First Owner may register to qualify for the benefits of this Limited Warranty by following the procedures specified after contacting FERRETTI at the address and phone set forth below.

*Choice of Forum and Law*. To the extent permitted by law, jurisdiction and venue shall be solely and exclusively in Miami-Dade County, Florida, and Florida law, excluding its principles of conflicts of laws, will apply. The United Nations Convention on the International Sale of Goods shall not apply.

*Exclusions:* This Limited Warranty excludes and does not cover:
a. Damage to the Yacht caused by (i) any alteration, modification, or repair to the Yacht or any component, unless specifically authorized in writing by FERRETTI or (ii)

failure to maintain the Yacht in accordance with applicable manuals, memoranda and generally accepted maintenance standards.
b. Any yacht that has been salvaged or declared a total or constructive loss.
c. Except for defects due to defective products or materials or improper workmanship, paints; varnishes; gel coats; anti-fouling products; chrome plated, anodized, aluminum, or other plated finishes; the color fastness of materials or finishes; external wood paneling, siding, and trimming; stainless steel, fabrics and canvas (all of which are subject to the effects of different climates and use, including cracking, discoloration, and crazing); osmosis blistering if the gel surface of the Yacht has been altered in any way including: repair, application of any coating other than marine anti-fouling bottom paint, improper surface preparation for paint, or excessive sanding or sandblasting.
d. Engines, engine parts, controls, accessories, air conditioning systems, bow thrusters, transmissions, electronics, batteries, appliances, propellers, generators, and any other equipment or components not manufactured by the Manufacturer, or the installation thereof. Some components are warranted by their manufacturers per the warranties they supply. *The Owner shall look exclusively to these manufacturers all warranty claims*.
e. Yachts which have been used for or subjected to: rental, charter or other commercial service; careless, reckless, improper or negligent operation; grounding, collision or other accident; hurricanes or other extreme forces of nature; military or paramilitary operations; racing or towing; improper storage, transportation, service, maintenance or use; use in violation of instructions provided by the Manufacturer or any governmental laws, regulations or rules.
f. Any published or announced speeds, fuel consumption, weight, draft and performance characteristics, since these are estimated.
g. Electrolysis, galvanic or crevice corrosion, or any deterioration of underwater items or repairs or replacement required as a result of lack of maintenance or improper use.
h. Damage or failure resulting from increasing the horsepower of the original engines installed by Manufacturer.
i. Any defect or repair requiring redesign of the Yacht or claims of non-compliance with the laws, regulations, rules, or recommended standards of any trade association, or governmental, or regulatory body or agency other than the governmental bodies or agencies of the United States.

*OTHER LIMITATIONS* . FERRETTI GIVES NO OTHER WARRANTIES, EXPRESS OR IMPLIED, ON THIS YACHT AND DISCLAIMS: (1) ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, AS WELL AS ANY CONTRACTS OR REPRESENTATIONS BY ANY PARTY RESPECTING THIS YACHT, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE (TO THE EXTENT SUCH CANNOT BE DISCLAIMED, THEY ARE LIMITED TO THE DURATION OF THE APPLICABLE EXPRESS LIMITED WARRANTIES HEREIN); (2) ANY LIABILITY FOR ECONOMIC LOSS ARISING FROM CLAIMS OF DEFECTS, PRODUCT FAILURE, NEGLIGENCE, DEFECTIVE DESIGN, FAILURE TO WARN OR INSTRUCT, LACK OF SEAWORTHINESS, AND ANY OTHER THEORY OF LIABILITY; AND (3) ANY LIABILITY FOR: INDIRECT, INCIDENTAL, OR CONSEQUENTIAL DAMAGES, COSTS OR EXPENSES, INCLUDING BUT NOT LIMITED TO: LOSS OF TIME, USE, VALUE OR INCONVENIENCE; RENTAL CHARGES, TRAVEL EXPENSES, CAPTAIN'S AND CREW MEMBERS' SALARIES; LOSS OF OR DAMAGE TO PERSONAL PROPERTY; DOCKAGE FEES, TOWING AND STORAGE CHARGES, AND THE COST OF TRANSPORTATION FOR REPAIR TO ANY REPAIR FACILITY; WHETHER INCURRED AS A RESULT OF ANY DEFECTS OR BECAUSE OF ANY STEPS THE OWNER TAKES TO BECOME ENTITLED TO REPAIR OR REPLACEMENT; INJURY TO OR DAMAGES TO PERSONS OR PROPERTY RESULTING FROM ANY INFORMATION PROVIDED BY THE DEALER IF ERRONEOUS OR NOT APPROVED IN ADVANCE IN WRITING BY FERRETTI OR MANUFACTURER; AND RESCISSION OR REVOCATION OF ACEPTANCE. THE REMEDIES SET FORTH ABOVE ARE OWNER'S SOLE AND EXCLUSIVE REMEDIES AND ARE IN LIEU OF ALL OTHER REMEDIES, EXPRESS OR IMPLIED. SOME STATES DO NOT ALLOW: (1) THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES OR (2) TIME LIMITATIONS ON THE DURATION OF AN IMPLIED WARRANTY, SO THESE LIMITATIONS MAY NOT APPLY TO YOU. RETAIL CUSTOMERS IN THE EUROPEAN ECONOMIC AREA MAY HAVE LEGAL RIGHTS REGARDING THE SALE OF CONSUMER GOODS WHICH ARE NOT AFFECTED BY THIS LIMITED WARRANTY. THIS WARRANTY GIVES YOU SPECIFIC LEGAL RIGHTS AND YOU MAY ALSO HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

FERRETTI GROUP USA
1445 SE 16th Street
Ft. Lauderdale, FL 33316
Tel.: (954) 760-6530        Model No._____
                            Hull No._____        Rev. 3-14

Buyer Initials:              Sellers Initials:



# FERRETTIGROUP

## CONDITIONAL ACCEPTANCE OF VESSEL

**Buyer:**                                                   Underwater Exploration Company, Inc.
                                                             and/or Assigns

**Year/Manufacturer/Make:**                                  2020 Riva 38-51

**Seller:**                                                  Ferretti Group of America, LLC.

**Hull ID #:**                                               XFARRM51L920

**Purchase and Sale Agreement Dated:**                       February 14, 2020

As buyer for the above referenced vessel, I hereby accept the vessel with the condition that the following items will be completed by Ferretti Group of America, LLC prior to closing:

### Windows, Hatches, and Doors

1. The port side fender storage locker latch is missing and needs to be replaced.
2. The starboard side sea bob locker latch is missing its dogging lever and the gas assist has been removed.

### Navigation Electronics, Communication and Monitoring Equipment

3. The VHF antenna has not been installed. The VHF radio could not be properly checked.

### Pumps

4. The gray water pump is leaking from the discharge fittings. The gray water pump discharge fittings need to be disassembled, inspected, and reinstalled.

### Safety

5. The plug on the bottom of the anchor light pole has not been installed. The anchor light could not be proven.
6. The kill switch magnet for the galley stovetop cover has not been installed. The kill switch is not functioning.

In addition, I acknowledge and agree that the following items will remain as Manufacturer's Standard:

1. The foredeck has a high gloss teak and holly finish. It will be slippery particularly when wet. Would strongly recommend considering applying a nonskid finish similar to the finish applied to the cockpit decks.
2. The Seakeeper system is not connecting to the Garmin display.

Buyer: _____
Underwater Exploration Company, Inc.
and/or Assigns

Date: 3/6/2020

Seller: _____
Simone Meletti, Vice President
Ferretti Group of America

Date:

Ferretti Group of America, LLC. ● 1445 Southeast 16th Street ● Ft. Lauderdale, FL 33316